IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 1, 2013 Session Heard at Murfreesboro[1]

# STATE OF TENNESSEE v. GLOVER P. SMITH

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Rutherford County**
**No. F-63667 Don R. Ash, Judge**

---

**No. M2011-00440-SC-R11-CD - FILED JUNE 19, 2014**

---

The defendant was indicted on two counts of fabricating evidence and on six counts of making a false report arising out of the disappearance of his wife. A jury convicted the defendant on all counts, and the trial court imposed a sentence of one year in the county jail followed by six years on probation. After a hearing on the defendant's motion for new trial, the trial court affirmed the convictions for making a false report but dismissed the convictions for fabricating evidence after concluding that no investigation was "pending" when the defendant fabricated evidence. Both the State and the defendant appealed. The Court of Criminal Appeals reinstated the defendant's convictions for fabricating evidence, dismissed as multiplicitous two convictions for making a false report, and affirmed the remaining convictions and sentences. We granted the defendant permission to appeal. Although we affirm the Court of Criminal Appeals' reinstatement of the defendant's convictions for fabricating evidence, we conclude that two of the defendant's convictions for making a false report should be dismissed because the evidence is insufficient to support these convictions. We also conclude that three of the defendant's convictions for making a false report are multiplicitous and therefore dismiss two of those convictions. We affirm the Court of Criminal Appeals in all other respects.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals**
**Affirmed in Part and Reversed in Part**

JANICE M. HOLDER, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

---

[1] Oral argument was heard in this case on October 1, 2013, at Middle Tennessee State University in Murfreesboro, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; Jeffrey D. Zenter, Assistant Attorney General; William Whitesell, Jr., District Attorney General; and Trevor Lynch, Assistant District Attorney General, for the appellee, State of Tennessee.

Jonathan L. Miley, Nashville, Tennessee, for the appellant, Glover P. Smith.

**OPINION**

I. Facts and Procedural History

In March 2009, the Rutherford County Grand Jury indicted Glover P. Smith on one count of fabricating evidence and four counts of making a false report. In October 2009, a superseding indictment charged Mr. Smith with two counts of fabricating evidence and six counts of making a false report. These charges resulted from the police investigation into Mr. Smith's December 2007 report to the Murfreesboro Police Department that his wife was missing. During a three-day jury trial in April 2010, the following facts were revealed.

At approximately 6:00 p.m. on December 6, 2007, John Flynt, a dispatcher[2] at the Murfreesboro Police Department, received a phone call on the non-emergency line from an individual who identified himself as Palmer Smith. The caller reported that his wife had been missing for a few hours, was diabetic, and likely needed food and insulin. After Mr. Flynt verified that Mrs. Smith had not been admitted to the local emergency room, he submitted a report to radio dispatch, which broadcasts the information to law enforcement officers. In his report, Mr. Flynt provided Mrs. Smith's name, age, description, vehicle description, and the last time that the caller had spoken with her. Based on Mrs. Smith's medical condition, Mr. Flynt considered the report to be an emergency.

<u>Officer Bobby Edwards</u>

At 6:03 p.m. on December 6, 2007, Officer Bobby Edwards of the Murfreesboro Police Department received the radio dispatch and arrived at the Smith residence at approximately 6:14 p.m. Mr. Smith told Officer Edwards that his diabetic wife left their home at 1:30 p.m. to do some Christmas shopping and that she normally returned home before dark. He described what Mrs. Smith was wearing and stated that she was driving a champagne-colored, 2000 Lincoln Navigator. Mr. Smith told Officer Edwards that his wife had approximately $600 in cash and that she may have gone to the Walmart on Rutherford

---

[2] Mr. Flynt testified that as dispatcher for the police department, he receives emergency and non-emergency calls for service and determines the appropriate response for each caller based on his or her need.

Boulevard to avoid the holiday shopping crowd and traffic. After Officer Edwards completed his written report, Mr. Smith reviewed the information and signed the report.[3]

Officer Edwards subsequently provided the information to radio dispatch and put out a BOLO ("be on the lookout") throughout the city. Officer Edwards also contacted Officer Dave Norton, who was assigned to patrol the area that included Walmart, and asked him to look for Mrs. Smith's vehicle in the parking lot. Officer Norton reported that he did not see the vehicle.

Captain Chris Guthrie

On the morning of December 7, 2007, Captain Chris Guthrie of the Murfreesboro Police Department learned of Mrs. Smith's disappearance. He traveled to the Walmart parking lot where he saw the Lincoln Navigator parked between two Budget rental trucks. Captain Guthrie approached the vehicle and found that it was unlocked and that the keys were in the ignition. He observed a purse in the front seat and a makeup bag near the center console. The vehicle was towed to the police department for processing, and the police department's forensic examination of the vehicle revealed no blood or fingerprints.

On the afternoon of December 7, 2007, Captain Guthrie and Major James Gage went to Mr. Smith's home to discuss his wife's disappearance. Mr. Smith told the officers that he had company and did not have time to speak with them. Captain Guthrie said that as he and Major Gage were leaving, Mr. Smith "got kind of irate" and asked, "Have you found my wife yet?" Captain Guthrie told Mr. Smith that they would return at a later time.

When the officers returned to the Smith home, Mr. Smith told them that his wife went shopping around 1:30 p.m. and had $300 to $500 with her. With Mr. Smith's consent, Captain Guthrie looked in Mr. Smith's garage where he saw what he described as a "green-ish looking, teal colored" beachcomber or old-time bicycle. Mr. Smith told them he understood he would "probably be a suspect in this."

On the morning of December 8, 2007, Captain Guthrie viewed the video recording from the Walmart parking lot cameras that had been provided by Ethan Highers, an asset protection associate for the Murfreesboro Walmart. The video recording included the

---

[3] Although Officer Edwards spoke with Mr. Smith for "quite a while" on the night of December 6, 2007, he did not include all of Mr. Smith's statements in the initial report that he filed on December 7, 2007. Approximately two years after his initial meeting, however, Officer Edwards prepared a supplemental report at the district attorney's request to include all of Mr. Smith's initial statements in anticipation of discovery requests.

Walmart parking lot activity on December 6, 2007. According to Captain Guthrie, the video showed a near collision between Mrs. Smith's Lincoln Navigator and another vehicle at approximately 2:24 p.m. and showed the Lincoln Navigator pulling into the parking space in which it was eventually found.

Captain Guthrie said that the video recording revealed that someone rode away on a bicycle similar in style to the bicycle he had observed in Mr. Smith's garage. Captain Guthrie described the bicycle rider as "an older person" and said that Mr. Smith "came to mind" as he viewed the video recording.

Mr. Smith came to the police department on the morning of December 8, 2007, to be interviewed, and Captain Guthrie showed the Walmart video recording to Mr. Smith. When asked if he recognized the person riding the bicycle, Mr. Smith responded that he did not. Captain Guthrie finished the interview and obtained consent to search Mr. Smith's home. Later that same day, Captain Guthrie conducted a search of the Smith home. Captain Guthrie took the bicycle from the garage because it was similar to the bicycle seen in the Walmart video. He also collected several dark-colored baseball caps and a tan jacket, which he described as similar to the clothing worn by the person riding the bicycle.

Captain Guthrie acknowledged that he could not determine the exact color of the bicycle in the video recording, which he had described as teal or green in his report, or whether it was the bicycle found in Mr. Smith's garage. Similarly, Captain Guthrie could not confirm if one of the baseball caps or the tan jacket taken from Mr. Smith's home during the search was worn by the person riding the bicycle in the video. He added that the Smith home was approximately six and one-half miles from the Walmart on Rutherford Boulevard and that the person riding the bicycle did not appear to be a woman. Captain Guthrie testified that an eyewitness saw the appellant riding the bicycle.

Detective Michael Taylor

On the evening of December 6, 2007, Detective Michael Taylor of the Murfreesboro Police Department was also informed of Mrs. Smith's disappearance and spoke with Mr. Smith by telephone about Mrs. Smith's failure to return home. Detective Taylor determined that Mrs. Smith's cell phone was still turned on but no one answered when it was called. Detective Taylor obtained information from the cell-phone provider about the location of the cell tower in contact with Mrs. Smith's cell phone.

At about 6:00 a.m. on December 7, 2007, Detective Taylor learned that Mrs. Smith's Lincoln Navigator had been located in the Walmart parking lot. He met with Captain Guthrie at that location. Detective Taylor said that the vehicle was parked in a somewhat

obscure location between two Budget rental trucks and that he did not believe a person going shopping would have parked there.

Detective Taylor watched the video recording of the parking lot along with other officers. He was present when Mr. Smith and family members came to the police station to watch the video recording on December 8, 2007. Mr. Smith identified Mrs. Smith's vehicle but could not identify the driver of the vehicle or the person riding the bicycle. Detective Taylor accompanied Captain Guthrie to the Smith home that evening to conduct the search.

On December 10, 2007, Detective Taylor interviewed Leah Talbert, who was identified as the owner of the vehicle that almost collided with the Lincoln Navigator in the parking lot. Ms. Talbert was shopping with her fiancé at the Walmart on Rutherford Boulevard on December 6, 2007. Ms. Talbert told Detective Taylor that her fiancé was driving her vehicle and that as they entered the Walmart parking lot, her vehicle was traveling behind what she believed was a white sport utility vehicle (SUV). The driver of the SUV began to enter a parking space but abruptly steered the vehicle back into Ms. Talbert's line of travel. Ms. Talbert's fiancé quickly stopped the vehicle to avoid hitting the SUV. Ms. Talbert told her fiancé not to honk the car horn because the driver of the SUV was an older man. She further explained that as they passed the SUV, she made eye contact with the other driver, whom she described as "an older man, probably in his 60s or so," with large-framed glasses and a "kinda" oval face with a chin that "came out from his face a little bit." According to Ms. Talbert, the man looked "well put together." Ms. Talbert's fiancé parked the car, and they went into the Walmart.

During the interview, Detective Taylor showed Ms. Talbert an array of photographs, and she identified Mr. Smith as the driver of the SUV. Ms. Talbert said that she had not seen Mr. Smith before the parking lot encounter and had not seen him on news broadcasts prior to viewing the photograph array. Ms. Talbert gave a written statement to police in which she acknowledged that she had described the driver of the SUV as probably in his late 50s or 60s and "skinny." Ms. Talbert told Detective Taylor that the driver had gray hair parted to the side. She saw the driver of the SUV for only a short time but made eye contact with him as they passed.

Detective Taylor recalled that during the investigation a green mountain bike was found within a couple of miles of the Walmart. He explained, however, that the mountain bike was not in riding condition and had handlebars that were different from the bicycle seen in the video recording. Detective Taylor could not confirm that any of the clothing recovered during the search of the Smith home was worn by the person on the bicycle. He acknowledged that paint scrapings from the bicycle found in Mr. Smith's garage did not match paint scrapings taken from the Lincoln Navigator. Detective Taylor agreed that Mr.

Smith had indicated that he suffered from a heart condition and had had hip replacement surgery. He did not, however, learn of any physical disability that would have prevented Mr. Smith from walking or riding a bicycle.

Major James Gage

Major James Gage of the Murfreesboro Police Department was informed of Mrs. Smith's disappearance at about 6:00 p.m. on December 6, 2007. Major Gage learned on December 7, 2007, that Mrs. Smith's vehicle been located at the Walmart parking lot. At approximately 4:00 p.m. on December 7, Major Gage accompanied Captain Guthrie to the Smith home. He also recalled that Mr. Smith asked them to leave because some neighbors were visiting and he wanted to enjoy their company.

Major Gage said that he and Captain Guthrie returned later on December 7, 2007, to interview Mr. Smith. Mr. Smith told them that his wife left the previous day at about 1:30 p.m. to shop and had $300 to $500 with her. Major Gage also noticed a bicycle in the garage.

The following morning, December 8, 2007, Mr. Smith, his daughter, and his son-in-law came to the police department to be interviewed. While Captain Guthrie and Detective Taylor were interviewing Mr. Smith's daughter, Major Gage overheard Mr. Smith and his son-in-law having a "stern talk" about money. Confronted by Major Gage, Mr. Smith admitted that his wife could have had $10,000 with her. Major Gage said that Mr. Smith told him he lied about the money because he failed to report the income from rental property to the Internal Revenue Service. Finally, Major Gage acknowledged that he did not check Mr. Smith's medical history, and he could not confirm that the bicycle taken from Mr. Smith's garage was the same bicycle seen in the Walmart video recording.

The jury convicted Mr. Smith on counts one and two of fabricating evidence and on counts three through eight, all of which alleged that Mr. Smith initiated or made a false report. The trial court imposed concurrent sentences for each of the counts as follows: four years, six months for counts one and two; three years for counts three, four, and five; four years, six months for count six; and three years for counts seven and eight, with a resulting sentence of one year in jail followed by six years on probation. The trial court merged count two into count one and counts four and five into count three. At a subsequent hearing on Mr. Smith's motion for judgment of acquittal or new trial, the trial court dismissed counts one and two, concluding that no investigation was "pending" when Mr. Smith parked Mrs. Smith's vehicle at the Walmart parking lot. The trial court, however, affirmed the remaining convictions. The State appealed the trial court's acquittal on counts one and two. Mr. Smith appealed the trial court's denial of his motion for a new trial on counts three through eight.

The Court of Criminal Appeals held that the trial court erred by partially granting the motion for judgment of acquittal or new trial, reinstated Mr. Smith's convictions for fabricating evidence, and affirmed the merger and sentence. The intermediate appellate court dismissed as multiplicitous counts four and five and affirmed the remaining convictions and sentences in counts six through eight. We granted Mr. Smith permission to appeal.

## II. Analysis

In this appeal, we are primarily concerned with Mr. Smith's contentions that the Court of Criminal Appeals erred by reinstating his two convictions for fabricating evidence and by failing to merge into one conviction his six charges for filing or initiating a false report because they are multiplicitous.

### A. Fabricating Evidence

We first consider Mr. Smith's argument that the Court of Criminal Appeals erred by reinstating his convictions for fabricating evidence under Tennessee Code Annotated section 39-16-503, which provides that:

> (a) It is unlawful for any person, knowing that an investigation or official proceeding is <u>pending or in progress</u>, to:
>
> > (1) Alter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding; or
> >
> > (2) Make, present, or use any record, document or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding.

Tenn. Code Ann. § 39-16-503 (emphasis added). The superseding indictment charged Mr. Smith in count one with violating subsection (a)(2) and in count two with violating subsection (a)(1) while an investigation was "pending."[4] Although the jury convicted Mr.

---

[4] Counts one and two of the indictment provided as follows:

Count One: [Mr. Smith] did unlawfully and knowing that an investigation or official proceeding was pending present or use a thing, to-wit: AN AUTOMOBILE, with knowledge of its falsity and with intent to affect the course of outcome

(continued...)

Smith on both counts, the trial court granted Mr. Smith's post-trial motion for judgment of acquittal in reliance on the Court of Criminal Appeals' unpublished opinion in State v. Callahan, No. E2002-00926-CCA-R3-CD, 2003 WL 1960267 (Tenn. Crim. App. Apr. 28, 2003). In Callahan, the defendant, a truck stop employee, called the store manager and reported that she had been robbed. Id. at *1. The defendant then covered the store's security camera, took money from the cash register, and called the police. Id. at *2. A jury convicted the defendant of tampering with or fabricating evidence. Id. A panel of the Court of Criminal Appeals reversed Callahan's conviction, concluding that an investigation was not pending or underway at the time the camera lens was covered. Id. at *3-4. Applying this holding to Mr. Smith's case, the trial court concluded that no investigation was "pending" when the acts were committed by Mr. Smith because the police had not yet been notified of Mrs. Smith's disappearance.

The Court of Criminal Appeals rejected the trial court's interpretation of Callahan and construed the term "pending" as it appears in Tennessee Code Annotated section 39-16-503(a) to mean "impending or about to take place." See State v. Smith, No. M2011-00440-CCA-R3-CD, 2012 WL 2674524, at *9 (Tenn. Crim. App. July 6, 2012) (citing Lumpkin v. State, 129 S.W.3d 659, 663 (Tex. App. 2004)). Mr. Smith challenges the intermediate appellate court's interpretation, and he maintains that because no investigation was pending or in progress when Mrs. Smith's vehicle was left at the Walmart parking lot, the evidence is insufficient to support his convictions for fabricating evidence.

Because this is an issue of statutory interpretation, we are presented with a question of law that we review de novo with no presumption of correctness. Wlodarz v. State, 361 S.W.3d 490, 496 (Tenn. 2012); State v. Tait, 114 S.W.3d 518, 521 (Tenn. 2003). When we interpret a statute, we must ascertain and give full effect to the General Assembly's intent. Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 309 (Tenn. 2008). Our primary concern is to carry out this intent without unduly expanding or restricting the language of the statute beyond the legislature's intended scope. Premium Fin. Corp. of Am. v. Crump Ins. Servs. of Memphis, Inc., 978 S.W.2d 91, 93 (Tenn. 1998). When the statutory language is clear and unambiguous, we apply the plain meaning of the statute. Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). If the language is ambiguous,

---

[4] (...continued)

of the investigation or official proceeding, in violation of T.C.A. 39-16-503.

Count Two: [Mr. Smith] did unlawfully and knowing that an investigation or official proceeding was pending alter or conceal any thing, to-wit: AN AUTOMOBILE, with intent to impair its verity or availability as evidence in the investigation or official proceeding, in violation of T.C.A. 39-16-503.

however, we look to the "broader statutory scheme, the history of the legislation, or other sources to discern its meaning." State v. Casper, 297 S.W.3d 676, 683 (Tenn. 2009).

In section 39-16-503, the terms "pending" and "in progress" are used as adjectives to describe the investigation or official proceeding. Those terms are not defined in the statute. Tenn. Code Ann. § 39-16-503(a). We gain insight, however, into the legislative intent in using these alternative terms in section 39-16-503 by examining the statute's origin.

On November 1, 1989, our General Assembly enacted a new criminal code that in large part adopted the American Law Institute's Model Penal Code. A significant portion of the Tennessee Criminal Code, however, was adopted from the Texas derivation of the Model Penal Code. See State v. Ducker, No. 01C01-9704-CC-00143, 1999 WL 160981, at *16 n.10 (Tenn. Crim. App. Mar. 25, 1999). The Model Penal Code and the Texas Penal Code vary in their definitions of the offense of tampering with or fabricating evidence. The Model Penal Code defines the offense as follows:

> A person commits a misdemeanor if, believing that an official proceeding or investigation is pending or about to be instituted, he:
>
> > (1) alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceedings or investigation; or
> >
> > (2) makes, presents or uses any record, document or thing knowing it to be false and with purpose to mislead a public servant who is or may be engaged in such proceeding or investigation.

Model Penal Code § 241.7 (1985) (emphasis added). The Model Penal Code's use of the alternative terms "pending" or "about to be instituted" indicates that the terms were not meant to be synonymous and evinces the drafters' intent to punish conduct that meets either description. The Texas Penal Code, in contrast, provides that:

> (a) A person commits an offense if, knowing that an investigation or official proceeding is pending or in progress, he:
>
> > (1) alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding; or

(2) makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding.

Tex. Pen. Code Ann. § 37.09 (West 2011) (emphasis added). The Model Penal Code and the Texas derivation, which Tennessee adopted, proscribe similar conduct and share common elements. The Tennessee/Texas version, however, departs from the Model Penal Code in its use of the alternative terms "pending" or "in progress." We must therefore determine whether this terminology variance between the Model Penal Code and the Tennessee/Texas version reflects a difference in legislative intent.

As an issue of first impression, we find it helpful to look to other jurisdictions to determine the meaning of "pending" or "in progress." Cooper v. Glasser, 419 S.W.3d. 924, 927 (Tenn. 2013). In Lumpkin, the Texas Court of Appeals, in construing the Texas fabricating evidence statute, acknowledged that a recognized definition of "pending" is "remaining undecided; awaiting decision or settlement; unfinished." 129 S.W.3d at 663 (quoting Random House Webster's Unabridged Dictionary 1433 (2d ed. 2001)). The Texas court recognized, however, that this definition of "pending" would create a redundancy in the statute. Id. As the court noted, "one of the cardinal principles of statutory construction is that we generally presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible." Id. The Lumpkin court therefore determined that the term "pending" within the Texas fabricating evidence statute means "impending, or about to take place." Id.

Because Tennessee adopted the Texas version of the Model Penal Code, we find the reasoning in Lumpkin persuasive. We also employ the rule of statutory construction in which we presume that "every word in a statute has meaning and purpose and should be given full effect if so doing does not violate the legislature's obvious intent." Casper, 297 S.W.3d at 683. We are likewise unable to conclude that the General Assembly intended to define the term "pending" in a manner that would be redundant with the alternative term "in progress." We therefore hold that the term "pending" in Tennessee Code Annotated section 39-16-503 means "impending."[5]

---

[5] To the extent that Callahan is inconsistent with our holding in this opinion, Callahan is expressly overruled. Our interpretation of "pending" is consistent, however, with other decisions of the Court of Criminal Appeals. See, e.g., State v. Middleton, No. W2010-01427-CCA-R3-CD, 2011 WL 5573730, at *22 (Tenn. Crim. App. Nov. 14, 2011) (affirming conviction for tampering with evidence when the defendant hid murder victims' bodies and destroyed other evidence before the crimes were discovered), perm. app. denied (Tenn. Apr. 12, 2012); State v. Ireson, No. E2010-01648-CCA-R3-CD, 2011 WL 2410322, at *6 (Tenn. Crim. App. June 10, 2011) (affirming conviction for fabricating evidence when the defendant planted (continued...)

We now consider whether the evidence is sufficient to support Mr. Smith's convictions for fabricating evidence under this statutory interpretation. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004). This standard applies whether the finding of guilt is based on direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010) (citing Casper, 297 S.W.3d at 683)).

The State concedes that the evidence supporting Mr. Smith's convictions for fabricating evidence is largely circumstantial. Circumstantial evidence is sufficient to sustain a defendant's conviction even if the evidence does not "remove every reasonable hypothesis except that of guilt." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011) (quoting United States v. Kelley, 461 F.3d 817, 825 (6th Cir. 2006)). The evidence presented, however, must be sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. State v. Cooper, 736 S.W.2d 125, 129 (Tenn. 1987).

In determining the sufficiency of the evidence, this Court should not reweigh or reevaluate the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999). Nor may this Court substitute its inferences for those drawn from the evidence by the trier of fact. Id. The trial judge and jury have the benefit of hearing the testimony of witnesses and of observing witness demeanor. Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). We therefore defer to the determinations made by the trier of fact concerning witness credibility, factual findings, and the weight or value given to the evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a jury renders a guilty verdict that is approved by the trial court, all conflicts are resolved in favor of the State, and we accredit the testimony of the State's witnesses. Cabbage, 571 S.W.2d at 835 (quoting State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)).

This Court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable inferences that may be drawn from the evidence. Jackson, 443 U.S. at 319; Goodwin, 143 S.W.3d at 775 (quoting State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes

---

[5] (...continued)
a knife on the victim before the crime was discovered), perm. app. denied (Tenn. Sept. 21, 2011); State v. Moore, No. W2009-01266-CCA-R3-CD, 2011 WL 856379, at *11 (Tenn. Crim. App. Mar. 9, 2011) (affirming conviction for tampering with evidence when the defendant hid the murder weapon and the victim's body before the investigation commenced), perm. app. denied (Tenn. July 14, 2011).

the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Specifically at issue in count one is whether the evidence is sufficient to prove that Mr. Smith knew an investigation was pending and "present[ed] or use[d]" Mrs. Smith's vehicle at the Walmart parking lot with knowledge of its falsity and with the intent to affect the course or outcome of the investigation into Ms. Smith's disappearance. Tenn. Code Ann. § 39-16-503(a)(2). At issue in count two is whether the evidence is sufficient to prove under section (a)(1) that Mr. Smith knew an investigation was pending and "alter[ed]" or "conceal[ed]" Mrs. Smith's vehicle with the intent to impair its verity or availability as evidence in the investigation.

The trial testimony revealed that Mr. Smith contacted the police dispatcher on the evening of December 6, 2007, to report that his wife was possibly missing. Mr. Smith told the dispatcher that Mrs. Smith may have gone Christmas shopping at the Walmart on Rutherford Boulevard. Officer Norton drove through the Walmart parking lot that evening but did not see Mrs. Smith's vehicle, a Lincoln Navigator. The vehicle was located the next morning in the Walmart parking lot parked between two Budget rental trucks.

A video recording from the Walmart security camera showed the Lincoln Navigator pulling into the parking space between the two trucks at approximately 2:24 p.m. on December 6, 2007. The video recording also showed a person wearing a tan jacket and a dark cap riding away on a bicycle. The video recording was shown to the jury. Leah Talbert and her fiancé almost collided with the driver of an SUV when attempting to park their vehicle. Ms. Talbert made eye contact with the driver and later identified Mr. Smith in a photograph array as the driver of the SUV. Upon searching Mr. Smith's home, Captain Guthrie recovered a bicycle that he described as similar to the one shown in the Walmart video recording. He also collected dark baseball caps and a tan jacket that he described as similar to the clothing worn by the person on the bicycle.

Accrediting the State's witnesses and affording the State the strongest legitimate view of the evidence, we conclude that the jury reasonably could have inferred from this evidence that Mr. Smith set the investigation in motion by initiating the missing person report to the police dispatcher. Mr. Smith therefore knew that an investigation was "impending" when he drove the Lincoln Navigator to the Walmart parking lot at 2:24 p.m. on December 6 with plans to subsequently report his wife's disappearance.

We further conclude that the jury could have reasonably inferred that Mr. Smith drove Mrs. Smith's Lincoln Navigator to the Walmart parking lot where he "presented" and "used"

the vehicle with the intent to affect the course or outcome of the investigation into his wife's alleged disappearance, knowing that the vehicle's presence at Walmart had nothing to do with her disappearance.

Whether Mr. Smith "altered" or "concealed" the vehicle with the intent to impair its verity or availability as evidence presents a closer question. "Conceal" means "to prevent disclosure of" a thing or "to place [a thing] out of sight." State v. Hawkins, 406 S.W.3d 121, 132 (quoting State v. Majors, 318 S.W.3d 850, 859 (Tenn. 2010)). The Walmart video recording supports the inference that the driver of Mrs. Smith's SUV made a conscious decision to park between the two rental trucks. Officer Norton patrolled the Walmart parking lot on the evening of December 6 and did not see Mrs. Smith's vehicle that was parked between the two trucks at the time of his patrol. Detective Taylor said that the vehicle was parked in a somewhat obscure location and that he did not believe a person going shopping would have parked there.

We agree that the evidence does not support an inference that Mr. Smith parked the vehicle between the two rental trucks to prevent its disclosure. Indeed, Mr. Smith suggested to Officer Bobby Edwards that Mrs. Smith may have gone shopping at the Walmart on Rutherford Boulevard. It was reasonable, however, for the jury to infer that Mr. Smith parked Mrs. Smith's vehicle "out of sight" in a remote area of the parking lot to impair its verity or truthfulness. In other words, the location of the vehicle raised additional questions as to how or when Mrs. Smith disappeared from the Walmart parking lot. In our view, this evidence posed a fact question that the jury resolved against Mr. Smith.

Accordingly, we hold that there is sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that Mr. Smith fabricated evidence as charged in counts one and two of the superseding indictment. We therefore affirm the Court of Criminal Appeals' reinstatement of the convictions and its affirmation of the merger of the alternative counts one and two.

B. Multiplicity/Unit of Prosecution

We next consider Mr. Smith's contention that the six counts of making or initiating a false report under Tennessee Code Annotated section 39-16-502 are multiplicitous and therefore violate the double jeopardy clauses of the United States and Tennessee Constitutions. Multiplicity is the charging of a single offense in several counts of an indictment. See State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996). Mr. Smith claims that all six counts were based on the same conduct and should have been combined into a single conviction. Whether multiple convictions violate double jeopardy is a mixed question of law

and fact that we review de novo with no presumption of correctness. State v. Thompson, 285 S.W.3d 840, 846 (Tenn. 2009).

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that no person shall be put in jeopardy of life and limb twice for the same offense. U.S. Const. amend. V. Similarly, the Tennessee Constitution guarantees "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Both clauses provide separate protections against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. See Schiro v. Farley, 510 U.S. 222, 229 (1994); State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996).

Mr. Smith's case falls within the third category—protection against multiple punishments for the same offense in a single prosecution. In these cases, the double jeopardy prohibition against multiple punishments functions to prevent prosecutors from exceeding the legislatively authorized punishment. State v. Watkins, 362 S.W.3d 530, 542 (Tenn. 2012).

In Watkins, this Court restructured Tennessee's double jeopardy analysis in single prosecution cases. Id. at 556 (abrogating the previous Denton rule).[6] In single prosecutions, multiple-punishment claims fall into one of two categories: (1) "unit-of-prosecution" claims or (2) "multiple description" claims. Id. at 543.

Unit-of-prosecution claims result when a defendant who has been convicted of multiple violations of the same statute asserts that the multiple convictions are for the same offense. Id. In contrast, multiple description claims arise when a defendant who has been convicted of multiple criminal offenses under different statutes alleges that the statutes punish the same offense. Id. at 544. In this instance, we are presented with both types of claims. Mr. Smith has been convicted in counts three through eight of violating subsections (a)(1), (a)(2), and (a)(3) of Tennessee Code Annotated section 39-16-502, including multiple counts under both subsections (a)(1) and (a)(2).

---

[6] Mr. Smith's application for permission to appeal preceded our decision in Watkins and therefore analyzed the double jeopardy claims under Denton and Phillips. The trial court and our intermediate appellate court also analyzed the claim under Phillips.

We first examine the multiple description claim to determine whether subsections (a)(1), (a)(2), and (a)(3) define the same offense.[7] Section 39-16-502 provides that

(a) It is unlawful for any person to:

(1) Initiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that:

(A) The offense or incident reported did not occur; or
(B) The person has no information relating to the offense or incident reported; or
(C) The information relating to the offense reported is false; or

(2) Make a report or statement in response to a legitimate inquiry by a law enforcement officer concerning a material fact about an offense or incident within the officer's concern, knowing that the report or statement is false and with the intent to obstruct or hinder the officer from:

(A) Preventing the offense or incident from occurring or continuing to occur; or
(B) Apprehending or locating another person suspected of committing an offense; or

(3) Intentionally initiate or circulate a report of a past, present, or impending bombing, fire or other emergency, knowing that the report is false or baseless and knowing:

(A) It will cause action of any sort by an official or volunteer agency organized to deal with those emergencies;

---

[7] The determination of whether two or more statutes define the same offense for double jeopardy purposes is a question of law. See, e.g., State v. Bernacki, 52 A.3d 605, 610 (Conn. 2012) (recognizing that a double jeopardy claim presents a question of law); Garrett v. State, 702 S.E.2d 470, 473 (Ga. Ct. App. 2010) (noting that if all of the elements of one crime are included in the other, the two crimes are the same as a "matter of law"); People v. Ream, 750 N.W.2d 536, 538 (Mich. 2008) (recognizing that a double jeopardy challenge presents a question of law); State v. Kelley, 226 P.3d 773, 775 (Wash. 2010) (noting that double jeopardy claims utilizing the test from Blockburger v. United States, 284 U.S. 299 (1932), are questions of law).

(B) It will place a person in fear of imminent serious bodily injury; or

(C) It will prevent or interrupt the occupation of any building, place of assembly, form of conveyance, or any other place to which the public has access.

Tenn. Code Ann. 39-16-502. A violation of (a)(1) or (a)(2) is a Class D felony, and a violation of (a)(3) is a Class C felony. Tenn. Code Ann. § 39-16-502(b)(1), (2). In Watkins, we adopted the two-pronged Blockburger test for multiple description claims. Watkins, 362 S.W.3d at 556. Under the Blockburger test, Tennessee courts must examine the statutory elements "in the abstract, without regard to the proof offered at trial." Id. at 544. In a Blockburger analysis, our primary focus is whether the General Assembly expressed an intent to permit or preclude multiple punishments. Id. at 556. If either intent has been expressed, no further analysis is required. Id. When the legislative intent is unclear, however, we must apply the "same elements test" from Blockburger. Id. at 546-47. Under this test, the first step is to determine whether the convictions arise from the same act or transaction. Id. at 545. The second step is to determine whether the elements of the offenses are the same. Id. at 557. If each offense contains an element that the other offense does not, the statutes do not violate double jeopardy. Id.

Because the legislature did not express a clear intent in Tennessee Code Annotated section 39-16-502 concerning multiple punishments, we must apply the Blockburger test. Although Mr. Smith maintains that the multiple charges arose out of the same event—his false report about his missing wife—he engaged in proscribed conduct on different dates involving a police dispatcher and three different law enforcement officers. Furthermore, subsections (a)(1), (a)(2), and (a)(3) each contain elements not found in the others. We therefore conclude that the legislature intended to permit multiple punishments.

We must next consider the unit-of-prosecution claim to determine whether Mr. Smith's two convictions under subsection (a)(1) and his three convictions under subsection (a)(2) violate double jeopardy.[8] Generally, we do not apply the Blockburger test when addressing a unit-of-prosecution claim. Watkins, 362 S.W.3d at 543. Instead, we must identify the legislature's intended focus as to the single unit of conduct for purposes of conviction and punishment. Watkins, 362 S.W.3d at 543 (quoting George C. Thomas, A Unified Theory of Multiple Punishment, 47 U. Pitt. L. Rev. 1, 11 (1985)); State v. Green, 172 P.3d 1213, 1217 (Kan. Ct. App. 2007) (recognizing that the courts must "ask how the legislature has defined the scope of conduct composing one violation of the statute") (quoting

[8] Mr. Smith was charged with a single violation of subsection (a)(3), and we therefore are not required to determine the unit of prosecution in count six.

State v. Harris, 284 162 P.3d 28 (Kan. 2007))); State v. Mata, 321 P.3d 291, 295-96 (Wash. Ct. App. 2014) (recognizing that the relevant inquiry is "to determine what act or course of conduct the legislature has defined as the punishable act").

In determining the unit of prosecution, we first examine the statute in question to determine if the statutory unit of prosecution has been expressly identified. Mata, 321 P.3d at 296. Next, we review the history of the statute. Id. Finally, we perform a factual analysis as to the unit of prosecution. Id. If there is ambiguity or uncertainty in defining the unit of prosecution, the "rule of lenity" requires the ambiguity to be resolved in favor of the defendant. Watkins, 362 S.W.3d at 543; State v. Lewis, 958 S.W.2d 736, 739 (Tenn. 1997).

We have examined Tennessee Code Annotated section 39-16-502 and conclude that the General Assembly did not expressly identify what act constitutes a single unit of prosecution in subsections (a)(1) or (a)(2). We therefore will review previous legislation on the subject in an effort to learn the General Assembly's present intent. Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 528 (Tenn. 2010).

In State v. Levandowski, this Court construed the previous version of Tennessee Code Annotated section 39-16-502. 955 S.W.2d 603 (Tenn. 1997). In Levandowski, a Kingsport police officer went to the Levandowski home to investigate a report of suspected child abuse and asked to see the child. Id. at 604. Ms. Levandowski told the officer that the child was on a bus to Chicago, but the child was found in a neighboring residence. Id. Ms. Levandowski was charged with making a false report in violation of section 39-16-502(a)(1). Id. The version of section 39-16-502 at issue in Levandowski provided as follows:

> It is unlawful for any person to:
>
> (1) Report to a law enforcement officer an offense or incident within the officer's concern:
>
> (A) Knowing the offense or incident did not occur; or
> (B) Knowing the person reporting has no information relating to the offense or incident; or
> (C) Knowing the information relating to the offense is false; or
>
> (2) Intentionally initiate or circulate a report of a past, present, or impending bombing, fire, or other emergency, knowing that the report is false or baseless and knowing:

(A) It will cause action of any sort by an official or volunteer agency organized to deal with those emergencies; or

(B) It will place a person in fear of imminent serious bodily injury; or

(C) It will prevent or interrupt the occupation of any building, place of assembly, form of conveyance, or any other place to which the public has access.

Tenn. Code Ann. § 39-16-502(a) (1991). A majority of this Court concluded that the word "report" used in section 39-16-502 applied to a written or oral statement initiated by a person and did not include a person's response to an inquiry by a law enforcement officer. Id. at 605. The dissent in Levandowski disagreed, concluding that the natural and ordinary meaning of the word "report" included statements given in response to questions from law enforcement officers. Id. at 607 (Drowota, J., dissenting).

Our Court of Criminal Appeals had reached a similar conclusion in its resolution of the Levandowski appeal. Levandowski, No. 03C01-9503-CR-00076, 1996 WL 315807 (Tenn. Crim. App. June 5, 1996). Like this Court, the Court of Criminal Appeals focused on the manner in which the report was communicated. Id. at *9-10. The Court of Criminal Appeals, however, examined the previous legislation, drafts, and comments from which section 39-16-502 derived to determine the purpose behind the false reporting statute. Id. at *8-9. The Sentencing Commission Comments, for example, indicate that the Commission believed the offense was necessary because "false reports can jeopardize public safety and order, and compromise the efficient allocation of scarce law enforcement resources." Id. at *8 (recognizing that section 39-16-502 is a derivation of the 1973 Draft Section 39-2209(a) and was similar to Tennessee Code Annotated section 39-5-524 (1983)). Further, the purpose of a similar offense defined in section 241.5 of the Model Penal Code, which proscribes the making of fictitious reports, is to "curtail[] the waste in time, energy, and expense involved in having law enforcement officers running down false leads concerning criminal conduct, and to protect private citizens from false accusations and resultant aggravation, embarrassment, and annoyance." Id. at *9 (citing 67 C.J.S. Obstructing Justice § 20).

Our decision in Levandowski prompted the General Assembly to amend section 39-16-502 in 1998 to its current form. Both the House and Senate sponsors of their respective bills explained that the legislation was introduced in response to Levandowski.[9]

---

[9] During the introduction of House Bill 2952 in the House Judiciary Committee, in the Calendar and Rules Committee, and on the House Floor, Representative Keith Westmoreland explained that the bill was (continued...)

During the discussion of Senate Bill 2188 on the Senate floor, Senator Ron Ramsey told the members that the bill would establish an offense for making a false report whether initiated by a person or made in response to a legitimate inquiry by law enforcement. Senator Robert Rochelle expressed his concern that the new bill carried the potential for abuse in that a person could be prosecuted for almost any statement made to a law enforcement officer that turned out to be false. Senator Joe Haynes explained that the offense of making a false report is committed when a person reports "something as having happened that in fact did not happen." Similarly, Senator James Kyle asked the members rhetorically what conduct the offense was originally meant to criminalize. He explained that the purpose of the offense was not to ensure that law enforcement officers would be told the truth. Instead, the original purpose was to punish a person who makes a false report. Senator Kyle gave an example of a person who reports that his television was stolen when in fact it was not. He added that the false report resulted in wasted resources by requiring the police to investigate an alleged crime that did not occur.

From these comments during the legislative debate of Tennessee Code Annotated section 39-16-502, we conclude that the General Assembly intended to criminalize two distinct types of conduct when it created subsections (a)(1) and (a)(2). Subsection (a)(1) proscribes the initiation of a false statement or report to a law enforcement officer, and subsection (a)(2) proscribes the making of a false statement or report in response to a legitimate inquiry by a law enforcement officer. Both statutes specifically narrow the conduct to a particular "incident or offense."[10] It is unclear, however, whether the legislature intended to punish each instance of initiating or making a false statement or report about the same incident or offense.

---

[9] (...continued)
filed in response to the Tennessee Supreme Court opinion in State v. Levandowski. Hearing on H. B. 2952 Before the H. Judiciary Comm., 100th Gen. Assemb. (Tenn. Mar. 4, 1998) (statement of Rep. Keith Westmoreland); Hearing on H.B. 2952 Before the Calendar & Rules Comm., 100th Gen. Assemb. (Tenn. Mar. 4, 1998) (statement of Rep. Keith Westmoreland); H. Floor Deb. on H.B. 2952, 100th Gen. Assemb. (Tenn. Mar. 19, 1998) (statement of Rep. Keith Westmoreland). Senator Ron Ramsey gave a similar explanation of Senate Bill 2188 during the discussion on the Senate Floor. S. Floor Deb. on S.B. 2188, 100th Gen. Assemb. (Tenn. Feb. 18, 1998) (statement of Sen. Ron Ramsey). Senator Keith Jordan told the Senate Judiciary Committee that the proposed bill would close the "loophole" in the statute. Hearing on S.B. 2188 Before the S. Judiciary Comm., 100th Gen. Assemb. (Tenn. Feb. 10, 1998) (statement of Sen. Keith Jordan).

[10] The terms "material fact" and "legitimate inquiry" were discussed by the members of the legislature in committee and on the floor. The terms were removed and reinserted to address members' concerns about protecting persons from charges based on peripheral facts and to prevent law enforcement from abusing its power by asking questions about a feigned criminal matter or by charging an individual under this section for a minor fact or mere misstatement. See generally Hearing on S.B. 2188 Before the S. Judiciary Comm., 100th Gen. Assemb. (Tenn. Feb. 10, 1998).

Because of this ambiguity within the statute, the rule of lenity mandates an interpretation that the legislature did not intend multiple punishments for multiple counts under this same statutory section. See State v. Marshall, 319 S.W.3d 558, 563 (Tenn. 2010). We therefore conclude that the unit of prosecution in subsection (a)(1) is the initiation of a false report or statement concerning an incident or offense and that subdivisions (a)(1)(A) through (C) are merely alternative means of violating subsection (a)(1). We similarly conclude that the unit of prosecution in subsection (a)(2) is making a false report or statement in response to a legitimate inquiry by a law enforcement officer concerning an offense or incident and that subdivisions (a)(2)(A) and (B) provide alternative means of violating subsection (a)(2).[11]

When a defendant is charged with multiple counts under the same subsection of Tennessee Code Annotated section 39-16-502 for statements or reports about the same incident or offense, the counts are multiplicitous only if the jury returns verdicts on more than one count.[12] Under such circumstances, the trial court must wait until the jury returns its verdict before dismissing counts as multiplicitous.

Before we consider whether the multiple counts under subsections (a)(1) and (a)(2) are multiplicitous in this case, we first examine the sufficiency of the evidence in counts three through eight under our standard discussed previously. In doing so, we find it useful to consider the counts in chronological order.

Count Six

Count six of the indictment alleged that on December 6, 2007, Mr. Smith initiated a report of a present or impending emergency, knowing that the report was false or baseless and knowing that it would cause action of any sort by an official or volunteer agency organized to deal with those emergencies. According to the State, the factual basis of count six was Mr. Smith's report to dispatcher John Flynt of the Murfreesboro Police Department.

---

[11] The State may therefore charge alternative counts in the indictment under subdivisions (A) through (C) of subsection (a)(1) and under subdivisions (A) and (B) of subsection (a)(2) depending on the proof. If, however, the jury returns a guilty verdict on more than one count under a subdivision, the trial court must enter judgment on a single count under the subsection and merge the remaining counts to avoid a multiplicity problem.

[12] See United States v. Chacko, 169 F.3d 140, 145 (2d Cir. 1999) (recognizing that multiplicitous counts in an indictment can violate the Double Jeopardy Clause only if the jury convicts on multiple counts); State v. Schoonover, 133 P.3d 48, 64-65 (Kan. 2006) (recognizing that there can only be one conviction for the unit of prosecution). Accordingly, a pretrial motion to dismiss counts of the indictment charging the same statutory section as multiplicitous would be an improper vehicle for resolving multiplicity issues.

It cannot reasonably be disputed that Mr. Smith initiated the report when he called Mr. Flynt at 6:00 p.m. on December 6, 2007. The jury heard Mr. Flynt's testimony that the call was received on a non-emergency line but that Mr. Flynt considered it to be an emergency because of Mrs. Smith's reported medical condition. The jury obviously chose to accredit Mr. Flynt's testimony and made its own determination that the report was about a present emergency. Further, Mr. Flynt's testimony in combination with the testimony regarding Mr. Smith's alleged fabrication of evidence permitted the jury to reasonably infer that Mr. Smith knew the report to the dispatcher was false or baseless. Mr. Smith drove Mrs. Smith's Lincoln Navigator to the Walmart parking lot at approximately 2:30 p.m. and therefore knew that Mrs. Smith was not driving her vehicle as reported.

Finally, Mr. Smith knew that his report would cause an agency response. Mr. Flynt told Mr. Smith that he would send an officer to speak with him and complete a missing persons report. Mr. Smith responded, "[Y]eah, I was going to ask you, what can you do for me. Will you look for her or what . . . ?" In response, Mr. Flynt told Mr. Smith that the officers would look for Mrs. Smith while on patrol. Mr. Smith responded that if Mr. Flynt sent someone, "I would be glad to talk with them." We conclude that the evidence was sufficient to support Mr. Smith's conviction in count six.

Counts Three and Four

Count three of the indictment alleged that Mr. Smith "initiate[d] a statement" to Officer Edwards on December 6, 2007, "knowing that the information relating to the offense was false." (Emphasis added). Count four alleged that Mr. Smith "initiated a statement" to Officer Edwards on December 6, 2007, "knowing that the offense did not occur." (Emphasis added). The State described count four as an "alternative count" based on the same conduct described in count three but under a different subsection requiring knowledge that the offense did not occur. The State said that these counts were based on Mr. Smith's December 6, 2007 statement to Officer Edwards.

The State argues that Mr. Smith initiated the statement or report to Officer Edwards about his missing wife. The 911 recording, which was played for the jury, revealed that Mr. Smith initiated the report by calling Mr. Flynt. During the 911 call, Mr. Flynt told Mr. Smith that he would send someone out to speak with him. Mr. Smith responded with appreciation and said that he would be glad to speak with an officer. Mr. Smith then said he did not want to leave the house in the event Mrs. Smith tried to call. Officer Edwards went to the Smith residence in response to the report initiated by Mr. Smith to follow up on Mr. Smith's report that his wife was missing.

Without question, Mr. Smith initiated the report to Mr. Flynt. We cannot conclude, however, that Mr. Smith "initiated" the statement to Officer Edwards as contemplated by subsection (a)(1). Instead, the testimony reveals that Mr. Smith repeated the statement in response to Officer Edwards' "legitimate inquiry" into Mr. Smith's report that his wife was missing. Accordingly, we conclude that the evidence is insufficient to support counts three and four, and we therefore dismiss both of these counts.

Counts Five, Seven, and Eight

Mr. Smith was charged in counts five, seven, and eight of the indictment with violations of subsection (a)(2). Count five alleged that Mr. Smith "knowingly ma[d]e a false statement in response to a legitimate inquiry" from Officer Edwards on December 6, 2007.[13] Count seven alleged that Mr. Smith "knowingly ma[d]e a [false] statement in response to a legitimate inquiry" from Major Gage on December 7, 2007.[14] Finally, count eight alleged that Mr. Smith "knowingly ma[d]e a [false] statement in response to a legitimate inquiry" from Detective Taylor on December 8, 2007.[15]

As to count five, the testimony revealed that Officer Edwards arrived at the Smith home in response to Mr. Flynt's dispatch to inquire into Mrs. Smith's disappearance. Mr.

---

[13] Count Five states in its entirety as follows:

[Mr. Smith] did unlawfully and knowingly make a false statement in response to a legitimate inquiry by a law enforcement officer, to-wit: BOBBY EDWARDS, MPD, concerning a material fact about an offense or incident within the officer's concern, knowing that such statement was false, with the intent to obstruct or hinder the officer from preventing the offense or incident from continuing to occur, in violation of T.C.A. 39-16-502.

[14] Count Seven states in its entirety as follows:

[Mr. Smith] did unlawfully and knowingly make a statement in response to a legitimate inquiry by a law enforcement officer, to-wit: JIM GAGE, MPD, concerning a material fact about an offense or incident within the officer's concern, knowing that such statement was false, with the intent to obstruct or hinder the officer from preventing the offense or incident from continuing to occur, in violation of T.C.A. 39-16-502.

[15] Count Eight States in its entirety as follows:

[Mr. Smith] did unlawfully and knowingly make a statement in response to a legitimate inquiry by a law enforcement officer, to-wit: MIKE TAYLOR, MPD, concerning a material fact about an offense or incident within the officer's concern, knowing that such statement was false and with the intent to obstruct or hinder the officer from preventing the offense or incident from continuing to occur, in violation of T.C.A. 39-16-502.

Smith told Officer Edwards that Mrs. Smith left their residence at 1:30 p.m. to go Christmas shopping but was usually home before dark. He described her clothing and explained that she was a diabetic. Mr. Smith told Officer Edwards that Mrs. Smith was driving a champagne-colored 2000 Lincoln Navigator. Officer Edwards prepared a report containing this information, and Mr. Smith reviewed and signed the report. Officer Edwards filed a supplemental report approximately two years later at the request of the district attorney. The supplemental report contained additional information provided to Officer Edwards by Mr. Smith, including his statement that Mrs. Smith was carrying approximately $600 in cash.

We conclude that the jury could have inferred from this evidence that Mr. Smith gave his statement in response to Officer Edwards' legitimate inquiry about Mrs. Smith. Based on the additional testimony concerning the charges of fabricating evidence, the jury reasonably could have inferred that Mrs. Smith's disappearance did not occur as Mr. Smith reported and that the information he provided to Officer Edwards was false. Finally, the evidence was sufficient to show that Mr. Smith made the false statement with the intent to obstruct or hinder the officer from preventing the offense or incident from occurring or continuing to occur.

The testimony relating to count seven revealed that Mr. Smith told Major Gage that his wife left to go shopping about 1:30 p.m. and had $300 to $500 with her. The testimony establishes that Mr. Smith made these statements in response to Major Gage's inquiry and that Mr. Smith's statements also related to the investigation into Mrs. Smith's disappearance. The primary variance between Mr. Smith's statements concerned the amount of money Mrs. Smith allegedly carried with her. Again, viewing this testimony in conjunction with the testimony concerning the charges of fabricating evidence, the jury reasonably could have inferred that the statements to Major Gage were false and were made with the intent to obstruct or hinder the officer from preventing the offense or incident from continuing to occur. We therefore conclude that the evidence is sufficient to support Mr. Smith's conviction in count seven.

The testimony supporting count eight revealed that Detective Taylor showed Mr. Smith the video recording from Walmart. When Detective Taylor asked Mr. Smith if he knew who was driving the Lincoln Navigator or who was riding away on the bicycle, Mr. Smith responded that he did not. The jury reasonably could have inferred from the evidence presented at trial that Mr. Smith drove the Lincoln Navigator to Walmart and rode away on the bicycle. Believing this evidence, the jury had a basis from which to infer that Mr. Smith's statement to Detective Taylor was false and that it was made with the intent to hinder the officer from preventing the incident from continuing to occur. We therefore conclude that the evidence presented at trial was sufficient to support Mr. Smith's conviction in count eight.

Having reviewed the sufficiency of the evidence, we now consider whether counts three through eight are multiplicitous. Count six is a single charge under subsection (a)(3) and therefore poses no multiplicity issue. Having concluded that the evidence is insufficient to support counts three and four, we have dispensed with the potential multiplicity issue presented by those claims under subsection (a)(1). Finally, as to counts five, seven, and eight, we note that the three false reports or statements were made to three different law enforcement officers on three different days. We recognize that each report contained some fact not discussed in the others, but the reports related to the same incident or offense and were in furtherance of the officers' investigation into the same incident or offense. The fact differences did not extend to a new incident or offense. Because we have concluded the unit of prosecution in subsection (a)(2) is the false statement or report made in response to a legitimate law enforcement inquiry about an incident or offense, we must conclude that the three convictions under subsection (a)(2) are multiplicitous. We therefore affirm count five and dismiss counts seven and eight.

### C. Sentencing

In light of our dismissal of counts three, four, seven, and eight, we find it appropriate to briefly address Mr. Smith's challenge to the length and manner of service of his sentence.

Following a sentencing hearing on June 1, 2010, the trial court determined that under Tennessee Code Annotated section 40-35-105, Mr. Smith is a Range I, Standard Offender. Based on the testimony presented at the hearing, the trial court applied the enhancement factor that Mr. Smith has a previous history of criminal behavior. Tenn. Code Ann. § 40-35-114(1). In mitigation, the trial court considered Mr. Smith's lack of a prior criminal record. Tenn. Code Ann. § 40-35-113(13). The trial court imposed a four-year six-month sentence for the Class C felonies, and imposed three-year sentences for each of the Class D felonies at thirty-percent. The trial court ordered the sentences to run concurrently.

The trial court imposed a sentence of split confinement, Smith, 2012 WL 2674524, at *23 (recognizing that split confinement is an alternative sentence), and ordered Mr. Smith to serve one year in the local jail followed by six years on probation. The trial court ordered restitution to the Murfreesboro Police Department and to the Tennessee Bureau of Investigation.

The Court of Criminal Appeals conducted an exhaustive de novo review of the length, range, and manner of service of Mr. Smith's sentence. Smith, 2012 WL 2674524, at *19-23. In doing so, the intermediate appellate court also addressed Mr. Smith's argument that he is entitled to full probation. Id. at *23 (noting that whether an appellant is entitled to an

alternative sentence and whether an appellant is entitled to full probation are different inquiries). Following its review, the court affirmed the sentence imposed by the trial court.

The de novo review conducted by the Court of Criminal Appeals preceded the release of our opinions in State v. Bise, 380 S.W.3d 682 (Tenn. 2012), and State v. Caudle, 388 S.W.3d 273 (Tenn. 2012). In Bise, we held that "sentences imposed by the trial court within the appropriate statutory range are now to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d at 708. In Caudle, we extended the Bise standard to questions related to probation or any other alternative sentence. 388 S.W.3d at 278-79.

We have reviewed the sentencing hearing transcript and the Court of Criminal Appeals' analysis in light of the Bise and Caudle standards and conclude that the trial court did not abuse its discretion in its imposition of Mr. Smith's sentence. We further conclude that our dismissal of counts three and four based on the insufficiency of the evidence and our dismissal of counts seven and eight as multiplicitous do not warrant modification of the sentence imposed by the trial court. The trial court correctly ordered the sentences to run concurrently, and the length of Mr. Smith's sentence is therefore unaffected by the dismissal of these counts. Accordingly, we affirm the effective sentence of one year in the county jail followed by six years of probation.

## III. Conclusion

We conclude that the term "pending" used in Tennessee Code Annotated section 39-26-503 means "impending." We also conclude that the evidence is sufficient to support Mr. Smith's convictions for fabricating evidence in counts one and two. We further conclude as to Mr. Smith's convictions for making a false report in counts three through eight as follows: (1) the offenses defined in Tennessee Code Annotated section 39-16-502(a)(1), (a)(2), and (a)(3) constitute separate offenses under the multiple description test and do not violate double jeopardy; (2) the unit of prosecution in Tennessee Code Annotated section 39-16-502(a)(1) is the initiation of a false report or statement concerning an incident or offense; (3) the unit of prosecution in Tennessee Code Annotated section 39-16-502(a)(2) is making a false report or statement in response to a legitimate inquiry by a law enforcement officer concerning an incident or offense; (4) the evidence is insufficient to support Mr. Smith's convictions on counts three and four, and both counts are dismissed; (5) the evidence is sufficient to support, and we affirm, Mr. Smith's conviction on count six; and (6) the evidence is sufficient to support Mr. Smith's convictions in counts five, seven, and eight; however, we dismiss counts seven and eight as multiplicitous. We affirm the Court of Criminal Appeals' reinstatement and merger of counts one and two. We reverse the Court of Criminal Appeals' dismissal of, and we reinstate, count five. Finally, we affirm Mr.

Smith's sentence. With respect to the remaining issues that were raised in this Court but were not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals.[16]

JANICE M. HOLDER, JUSTICE

---

[16] Although not raised at any point prior to his application for permission to appeal to this Court, Mr. Smith contends that the photograph array shown to Leah Talbert was conducted in an improper manner and that it was unduly suggestive. As we recently recognized in State v. Bishop, issues are generally waived unless they were raised in or presented to the trial court, properly presented to the intermediate appellate court in cases that cannot be appealed to this Court, or properly raised in the application for permission to appeal to this Court. Bishop, ___ S.W.3d ___, ___, No. W2010-01207-SC-R11-CD, 2014 WL 888198, *13 (Tenn. 2014) (citing State v. Bledsoe, 226 S.W.3d 349, 353 (Tenn. 2007)). Notwithstanding Mr. Smith's waiver of this issue, the plain error doctrine permits us to consider issues that were not properly preserved on appeal. Id. at *14 (citing Tenn. R. App. P. 36(b)). As Mr. Smith recognized, however, the record has not been adequately developed concerning Detective Taylor's handling of the photograph array. Accordingly, we are unable to conduct a plain error examination in this case.