PD-1316-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/17/2015 12:05:26 PM
Accepted 4/17/2015 12:27:45 PM
ABEL ACOSTA
CLERK

IN THE
COURT OF CRIMINAL APPEALS OF TEXAS

| | | |
|---|---|---|
| **GEORGE ANTHONY THURSTON,** | § | |
| *APPELLANT* | § | |
| | § | |
| **V.** | § | **NO. PD-1316-14** |
| | § | |
| **THE STATE OF TEXAS,** | § | |
| *APPELLEE* | § | |

*ON DISCRETIONARY REVIEW OF CAUSE NUMBER 02-13-00242-CR IN THE COURT OF APPEALS FOR THE SECOND COURT OF APPEALS DISTRICT OF TEXAS, AT FORT WORTH, TEXAS.*

**STATE'S BRIEF ON THE MERITS**

SHAREN WILSON
Criminal District Attorney
Tarrant County, Texas

DEBRA WINDSOR, Assistant
Criminal District Attorney
Chief, Post-Conviction

CHARLES M. MALLIN, Assistant
Criminal District Attorney
Tim Curry Criminal Justice Center
401 W. Belknap
Fort Worth, Texas  76196-0201
(817) 884-1687
FAX (817) 884-1672
State Bar No. 12867400
CCAappellatealerts@tarrantcountytx.gov

LISA McMINN
State Prosecuting Attorney

# TABLE OF CONTENTS

PAGE

INDEX OF AUTHORITIES ........................................................................ ii

STATEMENT OF THE CASE ....................................................................1

STATEMENT REGARDING ORAL ARGUMENT ............................................2

STATEMENT OF FACTS ........................................................................2

SUMMARY OF THE STATE'S ARGUMENT ................................................12

STATE'S RESPONSE TO APPELLANTS' QUESTIONS FOR REVIEW .....13

    I.  ARGUMENTS AND AUTHORITIES ..................................................13

    II. NECESSITY OF REMAND.................................................25

CONCLUSION AND PRAYER....................................................................28

CERTIFICATE OF COMPLIANCE ...............................................................29

CERTIFICATE OF SERVICE ....................................................................29

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Barrow v. State*,
241 S.W.3d 919 (Tex.App.- Eastland 2007, pet. ref'd) .....................18, 19, 21, 24

*Boykin v. State*,
818 S.W.2d 782...............................................................................................16, 17

*Briscoe v. State*,
2013 WL 4822878 (Tex.App.-Austin 2013, no pet.)...................................*passim*

*Dowthitt v. State*,
931 S.W.2d 244 (Tex.Crim.App.1996).................................................................17

*Eddins–Walcher Butane Co. v. Calvert*,
156 Tex. 587, 298 S.W.2d 93 (1957)...................................................................17

*Gonzales v. State*,
2005 WL 2951481 (Tex.App.-Dallas 2005, no. pet.)(not designated
for publication).....................................................................................................27

*Lumpkin v. State*,
129 S.W. 3d 659 (Tex.App.-Houston [1st Dist] 2004, pet. ref'd) ...............*passim*

*Maheffey v. State*,
364 S.W.3d 908 (Tex.Crim.App.2012)................................................................17

*Morter v. State*,
551 S.W.2d 715 (Tex.Crim.App.1977)................................................................17

*Ortiz v. State*,
2005 WL 2951505 (Tex.App.-Dallas 2005, pet. ref'd)(not
designated for publication)...................................................................................27

*Panell v. State*,
7 S.W.3d 222 (Tex.App.-Dallas 1999, pet. ref'd)...............................................15

*State v. Smith*,
436 S.W.3d 751 (Tenn. 2014)..................................................................20, 21, 24

*State v. Smith*,
No. M2011-00440-CCA-R3-CD, 2012 WL 2674524
(Tenn.Crim.App. July 6, 2012)(Application for Permission to
Appeal Granted by Supreme Court Dec. 13, 2012)(not designated
for publication)............................................................................................19,

*Thurston v. State*,
No. 02-13-00242-CR, 2014 WL 3536955 (Tex.App.-Fort Worth
July 19, 2014, pet. granted)(not designated for publication) ........................2, 27

*Whitelaw v. State,*
29 S.W.3d 129 (Tex.Crim.App.2000)..................................................................15

*Williams v. State*,
270 S.W.3d 140 (Tex.Crim.App.2008)............................................................18, 22

## Statutes

Tennessee Code Annotated section 39-16-505 ....................................................19

TEX. GOV'T. CODE § 311.021(2) .....................................................................16, 17

TEX. GOV'T. CODE § 311.011(a)............................................................................17

TEX. PENAL CODE § 6.03(b) ..................................................................................18

TEX. PENAL CODE § 37.09(a)(1)......................................................................*passim*

## Other Authorities

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1339
(3rd ed. 1992)......................................................................................................16

RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1433 (2d
ed.2001)..............................................................................................................16n

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1669 (1st ed.
1993) ....................................................................................................................16

IN THE
COURT OF CRIMINAL APPEALS OF TEXAS

GEORGE ANTHONY THURSTON, §
    *APPELLANT* §
                §
V. §        **NO. PD-1316-14**
                §
THE STATE OF TEXAS, §
    *APPELLEE* §

*ON DISCRETIONARY REVIEW OF CAUSE NUMBER 02-13-00242-CR IN THE COURT OF APPEALS FOR THE SECOND COURT OF APPEALS DISTRICT OF TEXAS, AT FORT WORTH, TEXAS.*

## STATE'S BRIEF ON THE MERITS

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

This brief is filed on behalf of the State of Texas, by and through Sharen Wilson, Criminal District Attorney of Tarrant County.

## STATEMENT OF THE CASE

The Appellant was indicted in the 371st District Court of Tarrant County, Texas., in Cause No. 1286534D for the murder of James Anders and in Cause No. 1293819D for the offense of Tampering with Evidence pursuant to § 37.09(a)(1) and § 37.09(d)(1) of the Texas Penal Code. [RR: I III at 5]. The murder and tampering cases were consolidated for trial. [RR: II at 22-23]. A jury acquitted Appellant on the murder charge, but convicted him on the tampering charge. [RR: VII at 6]. The same

1

jury assessed his punishment at eighty (80) years' confinement in the Institutional Division of the Texas Department of Corrections. [CR: I at 62]. Appellant's conviction was affirmed by the Second Court of Appeals in *Thurston v. State,* No. 02-13-00242-CR, 2014 WL 3536955 (Tex.App.-Fort Worth July 19, 2014, pet. granted)(not designated for publication). Appellant filed a motion for rehearing which was denied by the Second Court of Appeals on August 29, 2014. This Court granted Appellant's Petition for Discretionary Review.

## STATEMENT REGARDING ORAL ARGUMENT

The State is in agreement with the Appellant that oral argument would be helpful in this case. This case involves an issue of first impression concerning the statutory construction of Section 37.09(a)(1) of the Texas Penal Code, Tampering with or Fabricating Physical Evidence.

## STATEMENT OF FACTS

On May 28, 2012 Sean Baker, a train engineer with the Fort Worth and Western Railroad, noticed something out of place in a vacant lot alongside the railroad crossing located at Eighth Avenue and Windsor Place, commonly known as Windsor Hill. [RR: IV at 45-46, 49]. After a couple of days, Baker and his fellow employees spotted the article. [RR: IV at 52-53]. They then decided to see what was in the field. On May 28,

2012, two days before, they almost hit a white pick-up truck crossing the railroad tracks at that same location. [RR: IV at 52].

From the direction of the white truck, Baker detected a smell emanating from the vacant field. [RR: IV at 57]. The article observed in the field looked like a pile of rubble wrapped in a sleeping bag with a foot sticking out of it. [RR: IV at 58]. At that time, Baker could not stop the train because they would not be able to get the train moving again. *Id.;* [RR: IV at 58; State's Exhibits 102, 103]. Baker then called his supervisor, Jerry Stienkamp. [RR: IV at 58].

Steinkamp, the terminal operations director for Fort Worth and Western Railroad, dispatched Daniel Guido to the railroad crossing at Eighth Avenue and Windsor Place. [RR: IV at 63]. The police were called once it became obvious that there was a body concealed in the sleeping bag. [RR: IV at 63-64]. The police discovered that there was indeed a body wrapped in a sleeping bag with the head and feet sticking out. [RR: IV 71-72; State's Exhibits 8-13].

Fort Worth Patrol Officer John Souther was dispatched at about 5:00 p.m. to the scene. [RR: IV at 69-70]. As Officer Souther walked down the railroad tracks toward the body, he began to smell death. [RR: IV at 71]. He saw the head and feet sticking out of the sleeping bag. *Id.* Officer Souther also noticed that a moving blanket and a sleeping bag covering the body had been bound by a blue rope or nylon twine. [RR: IV

3

at 75]. He contacted his supervisor, followed by the crime-scene and homicide divisions. [RR: IV at 77].

Once at the location, Detective Matthew Barron observed the victim's body. [RR: IV at 168]. A cell-phone clip, but no cell phone, was on the victim's body. [RR: IV at 170]. The cell phone clip raised the possibility that the victim had a cell phone. *Id.* The police recovered a receipt, but it was not completely legible. *Id.* The officers deciphered three letters, O-W-N, which Barron concluded could be "town" or "crown." *Id.*

Dr. Lloyd White, a contract pathologist functioning as a Tarrant County deputy medical examiner, performed the autopsy and examination of the body later identified as Walter James Anders. [RR: IV 102-103, 110]. Dr. White described the numerous gunshot wounds inflicted on the victim. [RR: IV at 118-12, 135; State's Exhibits 27, 28]. In addition to wounds on his feet, hand, shoulder, and thigh, there were several bullet wounds to the victim's chest. [RR: IV at 124]. The victim's body demonstrated a cluster of exit wounds. *Id.* Four bullets were recovered from Anders' body. [RR: IV at 117]. Dr. White concluded that the cause of death was penetrating and perforating handgun wounds of the chest. [RR: IV at 139].

Detective Barron was able to contact Anders' mother, who told him that her son had a cell phone and gave him his cell phone number. [RR: IV 176]. She also

4

informed Detective Barron that Anders was living somewhere in the Arlington Heights neighborhood, possibly in a garage apartment.

Detective Barron started looking for stores with names like crown or town and found Crown Liquor on Vickery Street. *Id.* It was established that the receipt came from Crown Liquor, which was relatively close to where the body was found. [RR: IV at 177-80]. Crown Liquor was also in the general vicinity or part of town where another State's witness, Lisa Juran, lived. [RR: IV at 180].

Detective Barron obtained Mr. Anders' cell phone records. [RR: IV at 181]. Those records indicated a call directly to Juran. [RR: IV at 182-83]. Juran lived in the Arlington Heights neighborhood. [RR: IV at 180]. Crown Liquor was in the general vicinity of Juran's house. *Id.* The detectives drove by her house and saw that there was a detached garage. *Id.* Officers also discovered that a white 1989 Ford F250 pick-up truck like the one spotted by the railroad employees was registered to Juran. [RR: IV at 183]. It appeared that Juran had contacted the victim within a few days of when his body was found. [RR: IV at 184].

Detective Barron prepared and distributed a flier in an attempt to get information on Anders' murder. [RR: IV at 185]. Detective Barron and Detective Sullivan went to Juran's house on June 12, 2012. *Id.* They engaged Juran in conversation, and she was

in an extreme state of nervousness. [RR: IV at 190-91]. At that time, the detectives asked permission and were granted permission to look in the garage. [RR: IV at 193].

Once the detectives were in the garage area, they observed some tarps and a lounge chair identical to the one found with Anders' body. [RR: IV at 194, 197; State's Exhibits 44, 61-66]. They also saw a high-speed fan running and a bike belonging to the victim. [RR: IV at 198-99]. Detective Sullivan could smell decomposition. [RR: IV at 199]. At that point, the detectives obtained a search warrant. *Id.*

Inside the house, detectives found two weapons which were identified as a Taurus nine-millimeter pistol in its case, an empty box for another Taurus pistol, and a twelve-gauge shotgun. [RR: IV at 203]. Barron obtained ATF trace reports on the purchase of the guns, which were identical nine-millimeter pistols purchased at the same place one month apart. [RR: V at 16].

Inside the garage, the officers noticed air fresheners strategically placed throughout the structure and bricks on the floor with large red stains that appeared to be blood. [RR: IV at 203-04]. They observed and seized three shell casings on the floor. [RR: IV at 204-05]. Juran had given consent to the search of her house and garage during her interview and prior to the issuance of the warrants. [RR: IV at 207]. During the search of the home, the officers seized a knife from a little dresser inside

the front doorway. [RR: IV at 215; State's Exhibits 118-19]. During the crime-scene search of the garage, CSI discovered one bullet fragment. [RR: V at 30].

Based on information that the investigating officers obtained during the search of the Juran home and garage, and their conversations with Lisa Juran, an arrest warrant was obtained for Appellant on June 13, 2012. [RR: IV at 215-19]. On June 20. 2012, Appellant was apprehended. [RR: IV at 218- 219.] The 1989 white Ford pick-up truck had been seized from the arrest scene and placed in a secure bay at the auto pound. *Id*. A search warrant for the truck was obtained and executed on June 21, 2012. [RR: IV at 218-20; State Exhibit No. 133]. During the search of the truck, the officers retrieved a series of swabs taken and collected of stains for possible DNA testing. [RR: IV at 224-25]. Further, once Appellant was in custody, a search warrant issued to take a buccal swab. [RR: IV at 227-28]. Additionally, major case fingerprints were obtained. [RR: IV at 227].

Appellant's arrest was made in the 1000 block of Henderson Avenue in the downtown area of Fort Worth. [RR: V at 197-204]. He was spotted walking southbound with a gas can in his hand. [RR: V at 204]. When the Fugitive Unit attempted to arrest Appellant, he failed to cooperate, and he received injuries because of his resistance. *Id.*

7

Juran testified at trial that she had known Anders since 2011 and that he did yard work and odd jobs for her. [RR: VI at 13, 18]. She let Anders stay in her garage occasionally when he did not have any shelter. [RR: VI at 14]. The garage area was used as some type of "man cave" for Appellant. [RR: VI at 15-17]. Juran admitted that she had a 1989 white Ford F250 with a 460 engine. [RR: VI at 18].

On the day of the murder, Juran gave Anders a cash advance to do some work and left the house. Appellant and Anders were still there working on some chores. [RR: VI at 6]. When she returned home, neither Appellant nor Anders was there, and the white pick-up truck was gone. [RR: VI at 20-21]. The following morning, she started calling Anders on his cell phone, but she could not reach him. [RR: VI at 29-30]. She attempted to call him three or four times. [RR: VI at 31 ].

Eventually, Juran detected a foul odor coming from around the house. [RR: VI at 39]. She told Appellant it smelled like dead animals, and Appellant replied that he would find the problem and take care of it. [RR: VI at 40]. She thought the odor was something like a dead mother raccoon. [RR: VI at 42].

On the day after Memorial Day, Appellant asked Juran to help him load something into the pick-up truck. [RR: VI at 42-43]. It was 11:00 p.m. and Juran was wearing her nightgown. Appellant said to her, "Baby, I hate to ask you to do this, but could you come help me move something?" She replied that she would. [RR: VI at 43].

8

The truck was backed into the driveway, and she saw a large object rolled up and tied in a big blue tarp. [RR: VI 45-46, 48]. Juran had a mover's blanket that she had previously found on the side of I-35, which was also used to wrap the victim. [RR: VI at 47]. Juran did not see anything inside the tarp, and she had no knowledge about what type of object was wrapped up in the tarp. [RR: VI at 48]. She did note that there was a foul odor emanating from the tarp. [RR: VI at 49].

Appellant and Juran loaded the smelly object into the pick-up truck using a particle board as a ramp to assist them. [RR: VI at 50]. Juran testified that she assumed Appellant was going to take the tarp and the object wrapped up in it to a dumpster. [RR: VI at 53]. She was asleep when Appellant returned from disposing of the tarp. [RR: VI at 55]. When Juran found out about the flier distributed by the police, she began to suspect that something had happened to Anders. [RR: VI at 56].

Appellant eventually told Juran that Anders was sitting on one of the lounge chairs in the so-called "man cave" garage and had consumed about a half bottle of rum. There was a click in Anders' eye, and he came after Appellant. [RR: VI at 58-59]. According to Appellant, Anders had a knife in his hand and was trying to get Appellant. [RR: VI at 60]. Appellant told Juran that he picked Anders up and threw him against the wall. Anders did not drop the knife, and Appellant told him to put the knife down; however, Anders again came after him, and Appellant "unloaded" into

9

him. [RR: VI at 61]. Appellant specifically told Juran that, when Anders came after him with a knife the second time, he automatically reached for the gun and did what the Army trained him to do, *i.e.*, he grabbed the gun and started shooting. [RR: VI at 62].

Appellant testified on his own behalf about the events. Appellant told the jury that the victim was a heavy drinker, but he was not around Appellant when he did. [RR: VI at 138]. He further testified that, in the past two months, Anders' drinking got out of control, and he started getting in trouble in various places where he was living and staying. [RR: VI at 140]. Appellant was in the Army, and he believed that "[i]f someone's trying to hurt, harm, or kill me, myself, my love ones, I have a right to defend myself and my family and my love ones." [RR: VI at 144].

Appellant explained that, around 10:00 a.m. on the morning of Anders' death, he went to a local liquor store and bought a six-pack of beer and cigarettes for himself and a bottle of rum for Anders. [RR: VI at 151]. The two men then went back to Juran's house. The beer went into the cooler, and the rum was put on the garage work table. [RR: VI at 152]. Around 2:30 p.m., Appellant decided to clean one of Juran's guns, so he went to the bedroom to retrieve it. [RR: VI at 154]. When he started to clean the pistol, he and Anders had a few words about drinking. [RR: VI at 156]. Appellant thought Anders had been drinking too much, and they started arguing. *Id.* Appellant

testified that he then asked Anders to go ahead and gather up the tools and call it a day, but Anders did not want to do that and wanted to continue working. [RR: VI at 157]. The argument grew louder and more abusive. *Id.*

Appellant claimed that Anders had the knife out and that he grabbed Anders by the wrist and hurled him toward the wall. [RR: VI at 158]. Anders was on the ground and still had the knife. Appellant grabbed the pistol off the table and told Anders to drop the knife. Appellant testified, "He ain't dropping it. He's looking right at me. He's just about got everything cleared off of him, and I just pointed the pistol and started firing." [RR: VI at 159]. Appellant admitted firing all of the rounds in the magazine into Anders. [RR: VI at 160-61].

Appellant eventually put Anders' body in a sleeping bag, threw a tarp over him, folded it up, rolled it up, and tied it with blue rope so that nothing was exposed. [RR: VI at 170-72]. He backed the truck up to the garage and had Juran assist him in putting the wrapped-up body in the truck. [RR: VI at 173]. He drove the truck down by the railroad crossing, where there was a vacant lot, and disposed of the body. [RR: VI at 176].

The next morning, Appellant went back into the garage and splashed a bottle of ammonia around. He broke down both guns into parts like he was going to clean them,

gathered the parts in plastic bags, and went around disposing of the parts at stores and job sites. [RR: VI at 181, 223-26].

After both sides rested and closed, the trial court gave the jury its instructions. [CR: I at 43-47]. The court's charge in cause number 1293819D instructed the jury that Appellant could be convicted for tampering with physical evidence, a human corpse, under § 37.09(d)(1) or in the alternative under § 37.09(a)(1). [CR: I at 44-45]. After deliberating the jury returned a general verdict of "guilty" to the tampering allegation. [CR: I at 48].

## SUMMARY OF THE STATE'S ARGUMENT

The Second Court of Appeals correctly adopted the statutory construction analysis performed by the Houston Court of Appeals in *Lumpkin v. State,* 129 S.W. 3d 659, 663 (Tex.App.-Houston [1st Dist] 2004, pet. ref'd). In order to give full effect to all the words, terms and phrases in § 37.09(a)(1), the word "pending" meant impending. Appellant would render the use of the word "pending" as an alternative to the use of the phrase "in progress" null and void. He would reduce subsection (a)(1) to nothing more than an exercise in redundancy, rendering that portion of the statute useless.

## STATE'S RESPONSE TO APPELLANTS' QUESTIONS FOR REVIEW

Appellant's Questions For Review:

In the context of tampering with evidence, how far does the "impending or about to take place" definition of "pending" extend? Is it limited to investigations flowing directly from the defendant's actions? Or does it extend to situations where the defendant is both temporally and proximately removed from the initiation of the investigation.

State's Response:

The Second Court of Appeals was correct in utilizing the definition of "pending" meaning "impending" as analytical construct in measuring the sufficiency of the evidence under Section 37.09(a)(1) so that all the language in the provision was given effect and to avoid redundancy.

## I.
## ARGUMENTS AND AUTHORITIES

Put simply, the Fort Worth Court of Appeals was correct in utilizing the appropriate definition of the term "pending" as articulated in *Lumpkin v. State,* 129 S.W. 3d at 663, as an analytical construct to measure the sufficiency of the evidence for a conviction under § 37.09(a)(1). This provision was meant to embrace factual scenarios such as in the instant case. Section 37.09(a)(1) states:

a) A person commits an offense if, knowing that an investigation or

official proceeding is pending or in progress, he:

(1) alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding.

The essence of Appellant's complaint under § 37.09(a)(1) is that he interprets the phrase "pending or in progress" to require that the investigation or official proceedings have had to formally commence before the actual tampering of the physical evidence transpired. In other words, Appellant's entire argument is that, in order for the evidence to be sufficient under § 37.09(a)(1), the evidence had to establish that he knew that an actual investigation was pending, in that it was underway, when he concealed the corpse of James Anders. He contends that it was not, that the investigation was both temporally and proximately removed, and that the evidence was insufficient to support his conviction. His interpretation has been and should be rejected.

Appellant eschews the *Lumpkin* analysis of the term "pending or in progress" in the context of determining sufficiency under subsection (a)(1). The *Lumpkin* court on this matter wrote:

At first blush, the terms "pending" and "in progress" appear to be synonymous. Indeed, one definition of the adjective "pending" is "remaining undecided; awaiting decision or settlement; unfinished." Random House Webster's Unabridged Dictionary 1433 (2d ed.2001). However, one of the cardinal principles of statutory construction is that we generally presume that every word in a statute has been used for a

14

purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible. *See Whitelaw v. State,* 29 S.W.3d 129, 131 (Tex.Crim.App.2000). To avoid redundancy from use of the terms "pending" and "in progress," we look to a second definition of the adjective "pending," which is "about to take place; impending." Random House Webster's Unabridged Dictionary 1433 (2d ed.2001). Construing "pending" as meaning "about to take place, impending" places the Texas statute in harmony with other jurisdictions using the Model Penal Code terminology "believing that an official proceeding [or investigation] is pending or may be [or is about to be or is likely to be] instituted." Model Penal Code § 241.7; Colo.Rev.Stat. Ann. § 18–8–610 (West 2003); D.C.Code Ann. § 22–723 (2001); Fla. Stat. Ann. § 918.13 (West 2003); Ky.Rev.Stat. Ann. § 524.100 (Banks–Baldwin 2003); Mont.Code Ann. § 45–7–207 (2002); Ohio Rev.Code Ann. § 2921.12 (West 2003); Utah Code Ann. § 76–8–510.5 (2003). Accordingly, we hold that the term "pending" in the Texas tampering-with-evidence statute means "impending, or about to take place."

*Lumpkin v. State,* 129 S.W.3d at 663. The *Lumpkin* Court severely criticized the Dallas Court of Appeals' decision in *Panell v. State,* 7 S.W.3d 222, 223 (Tex.App.-Dallas 1999, pet. ref'd), and commented that it disagreed with that court's interpretation of § 37.09(a)(1) because it failed to speak to the meaning of the terms "pending" and "in progress." *Lumpkin v. State,* 129 S.W3d at 663.

The *Lumpkin* Court relied on one of the cardinal principles of statutory construction: the reviewing court must generally presume that every word in the provision has been used for a purpose and each word, phrase, clause, and sentence should be given effect if reasonably possible. *Id., citing, Whitelaw v. State,* 29 S.W.3d 129, 131 (Tex.Crim.App. 2000). In keeping with that principle, the Court looked to

the full definition of "pending" which included "about to take place, impending."[1]

This construction gave effect to both "pending" and "in progress." Thus the Court

determined that the term "pending" in the Texas tampering-with-evidence statue meant

"impending, or about to take place" for the purpose of determining the sufficiency of

evidence. *Id.* This definition also put the Texas provision in harmony with other

jurisdictions that used Model Penal Code terminology. *Lumpkin v. State,* 129 S.W.3d

at 663.

Appellant criticizes *Lumpkin* for relying on a single source in arriving at a

definition of "pending." However, other dictionaries are likewise consistent with the

Random House definition. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY

1669 (1st ed. 1993); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH

LANGUAGE 1339 (3rd ed. 1992).

Also, the *Lumpkin* analysis is consistent with the Code Construction Act, TEX.

GOV'T. CODE § 311.021(2). The starting point in any question of statutory construction

is the text of the statute itself. When a statute is clear and unambiguous, reviewing

courts apply the plain meaning of its words. *Boykin v. State*, 818 S.W.2d 782, 785–786

& 786 n. 4 (Tex.Crim.App.1991). Next, the courts examine extratextual factors only

when the words of the statute are ambiguous or the plain meaning would lead to absurd

---

[1] The Court relied on the RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1433 (2d

results. *Id.* In determining plain meaning, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and usage." TEX. GOV'T CODE § 311.011(a); *Dowthitt v. State*, 931 S.W.2d 244, 258 (Tex.Crim.App.1996). More to the point, the Code Construction Act mandates that the appellate courts presume that "the entire statute is intended to be effective." TEX. GOV'T. CODE § 311.021(2); *Dowthitt v. State*, 931 S.W.2d at 258. "Every word in a statute has been used for a purpose and each word, phrase, clause, and sentence should be given effect if reasonably possible." *Maheffey v. State,* 364 S.W.3d 908, 913 (Tex.Crim.App.2012)(In interpreting statutes, we presume that the Legislature intended for the entire statutory scheme to be effective); *Dowthitt v. State,* 931 S.W.2d at 258; *Morter v. State*, 551 S.W.2d 715, 718 (Tex.Crim.App.1977), quoting *Eddins–Walcher Butane Co. v. Calvert*, 156 Tex. 587, 591, 298 S.W.2d 93, 96 (1957). By taking the approach utilized in *Lumpkin* the courts gave effect to the entire statute, assigning a meaning to each phrase and word, thus, "pending" and "in progress" were different covering the full gambit of situations dealing with tampering of evidence.

Likewise, other courts of appeals have approved of the *Lumpkin* statutory construction. In *Briscoe v. State,* 2013 WL 4822878 (Tex.App.-Austin 2013, no pet.), the defendant was indicted both for the offense of murder and tampering-with-

ed.2001).

17

evidence. As to the tampering charge it was apparent that Briscoe had concealed the murder victim's body in a wooded green belt area located one-half block from his father's home. Briscoe claimed that the evidence was insufficient to establish the tampering charge, because the State failed to prove beyond a reasonable doubt that he knew that an investigation was pending when he concealed the body. Rejecting the *Pannell* rationale and citing this Court's holding in *Williams v. State,* 270 S.W.3d 140, 142-43 (Tex.Crim.App.2008) and TEX. PENAL CODE § 6.03(b), the Austin Court noted that regarding the actor's knowledge of the pending investigation, a "person acts knowingly, or with knowledge, with respect to the ... circumstances surrounding his conduct when he is aware … that the circumstances exist." The Court then went on to seemingly approve the notion that the State met its burden if it established that the defendant was aware an investigation was "impending or about to take place." *Briscoe v. State,* 2013 WL 4822878 at *6.

In *Barrow v. State,* 241 S.W.3d 919 (Tex.App.- Eastland 2007, pet. ref'd), the Eastland Court adopted the *Lumpkin* statutory construction analysis, and explained:

> Barrow relies upon *Lumpkin v. State*, 129 S.W.3d 659 (Tex. App.-Houston [1st Dist.] 2004, pet. ref'd). There, the court held that the evidence was insufficient to sustain a conviction for tampering when the defendant swallowed cocaine after being pulled over for speeding. The court noted that Section 37.09(a) provided alternative methods for alleging knowledge of an investigation-either that it be "pending" or "in progress." *Lumpkin*, 129 S.W.3d at 663. To distinguish between them, the court held that "pending" means "about to take place; impending." Id.

18

> (citing Random House Webster's Unabridged Dictionary 1433 (2d ed.2001)). The court noted that the indictment alleged only that an investigation was in progress. Because the only investigation in progress when the defendant swallowed the cocaine was the traffic stop, the court held that the evidence was insufficient. Id. The clear import of the court's opinion, however, is that, if the indictment had alleged that the investigation was "pending," then the evidence would have been sufficient. *Lumpkin v. State,* 129 S.W.3d at 923.

*Id.* Thus, when the indictment alleges "pending" the *Lumpkin* rationale is applicable.

Initially, the State pointed out to the Second Court of Appeals that the Tennessee Court of Criminal Appeals in interpreting its own tampering provision, which was adopted by the Tennessee Legislature from § 37.09 of the Texas Penal Code, approved the *Lumpkin* statutory construction of subsection (a)(1) by stating, "[w]e are persuaded that the Texas Court of Appeals' reasoning is correct and conclude that "pending" means "impending or about to take place." Once the police are notified, an investigation is "in progress." *State v. Smith,* No. M2011-00440-CCA-R3-CD, 2012 WL 2674524, at *9 (Tenn.Crim.App. July 6, 2012)(Application for Permission to Appeal Granted by Supreme Court Dec. 13, 2012)(not designated for publication).

In the interim, the Tennessee Supreme Court accepted the *Smith* appeal and considered the issue concerning the meaning of "pending" in its own tampering provision, Tennessee Code Annotated section 39-16-505. The Court noted that the Texas version of tampering was a derivation of the Model Penal Code, and that Tennessee adopted a version of tampering that proscribed similar conduct and shared

19

common elements with the Texas tampering statute. *State v. Smith,* 436 S.W.3d 751, 762-63 (Tenn. 2014). Most importantly, both Tennessee and Texas departed from the Model Penal Code in its use of the alternative terms "pending" or "in progress." *Id.* The Court followed the *Lumpkin* Court's reasoning, writing:

> As an issue of first impression, we find it helpful to look to other jurisdictions to determine the meaning of "pending" or "in progress." *Cooper v. Glasser*, 419 S.W.3d 924, 927 (Tenn.2013). In *Lumpkin*, the Texas Court of Appeals, in construing the Texas fabricating evidence statute, acknowledged that a recognized definition of "pending" is "remaining undecided; awaiting decision or settlement; unfinished." 129 S.W.3d at 663 (quoting Random House Webster's Unabridged Dictionary 1433 (2d ed.2001)). The Texas court recognized, however, that this definition of "pending" would create a redundancy in the statute. Id. As the court noted, "one of the cardinal principles of statutory construction is that we generally presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible." Id. The *Lumpkin* court therefore determined that the term "pending" within the Texas fabricating evidence statute means "impending, or about to take place." Id.
>
> Because Tennessee adopted the Texas version of the *Model Penal Code*, we find the reasoning in *Lumpkin* persuasive. We also employ the rule of statutory construction in which we presume that "every word in a statute has meaning and purpose and should be given full effect if so doing does not violate the legislature's obvious intent*." Casper,* 297 S.W.3d at 683. We are likewise unable to conclude that the General Assembly intended to define the term "pending" in a manner that would be redundant with the alternative term "in progress." We therefore hold that the term "pending" in Tennessee Code Annotated section 39–16–503 means "impending."

*State v. Smith,* 436 S.W.3d at 763. Because Texas employs a variation of the tampering-with-evidence provision that includes alternate terms in § 37.09(a)(1)

the holdings of *Smith, Lumpkin* and *Briscoe* are of sound reasoning as they give full play to the meaning of all the words, terms, and phrases in the provision.

The statutory construction originally done by the *Lumpkin* Court and followed by the Second Court of Appeals in this case, and by other Courts in Texas including *Briscoe,* and *Barrow,* and by the Tennessee Supreme Court in *State v. Smith,* simply invoked the presumption that every word in a statute was used for a purpose and that each word, phrase, clause, and sentence was to be given effect. *Lumpkin v. State,* 129 S.W.3d at 663. Taking the approach suggested by Appellant would mean that the word "pending" and the phrase "in progress" are synonymous. Such a narrow position would render § 37.09(a)(1) redundant and would make the use of the phrase "in progress" useless if not void. The Fort Worth Court of Appeals' opinion neither extends the definition beyond the scope of the statute nor contravenes the meaning of the language the legislature used in promulgating it.

Thus, as to Count One, Paragraph Two, when the *Lumpkin* definition of "pending" is applied to TEXAS PENAL CODE § 37.09(a)(1), the investigation was "impending." *Lumpkin v. State*, 129 S.W.3d at 663; *see Barrow v. State*, 241 S.W.3d at 923; *Briscoe v. State*, No. 03-11-00014-CR, 2013 WL 4822878, at *6; *State v. Smith,* 436 S.W.3d at 762-63. Viewing all the evidence in the light most favorable to the verdict as set out under this issue in reference to Count One, any rational juror

could have concluded beyond a reasonable doubt that Appellant was guilty of tampering with or fabricating physical evidence.

Appellant claims the cases illustrate the need for the defendant's or a third party's proximity to the investigation in order for the evidence to be sufficient. This proposition is without merit. First, to mandate such a requirement would be to graft an additional element onto § 37.09(a)(1), and a reading of the statute does not support the conclusion that a defendant's or a third party's proximity would be a constituent element of the offense. *See Williams v. State,* 270 S.W.3d at 144.

Second, even if this Court were to require some type of proximity, Appellant's own testimony provided ample evidence to support a conclusion of legal sufficiency. Appellant testified that he shot the victim over an argument concerning James Anders' drinking at Juran's home. Appellant claimed he acted in self-defense after he was attacked by Anders with a knife. [RR: VI at 156-63]. He admitted getting off seventeen rounds and that Anders' body had twelve wounds. [RR: VI at 160]. As to concealing Anders' body, Appellant's testimony reflected:

- Appellant knew he was in trouble because he had just shot a person and he had a prior felony conviction. [RR: VI at 167].

- Appellant didn't want to bring any attention to the location where the crime took place. [RR: VI at 176].

22

- Appellant picked up everything he could in the garage where the shooting took place. [RR: VI at 170].

- Appellant got out a sleeping bag, put James Anders in the bag and zipped him up in it. [RR: VI at 176].

- Appellant threw a blue tarp over Mr. Anders. *Id.*

- Appellant roped-up the tarp, backed up the truck to the garage, had Juran assist him and put the corpse in the bed of the truck. [RR: VI at 173].

- After putting items in the truck, Appellant went and got bleach and splashed it around the garage. [RR: VI at 175].

- The next morning, Appellant took a bottle of ammonia and splashed it around the garage because of the smell in there. [RR: IV at 175].

- Appellant drove the truck down to the railroad tracks and left the corpse in that area. [RR: VI at 176].

- After dumping the body Appellant continued to cleanse the garage where the shooting took place. [RR: VI at 176-177].

- Appellant took the pistol he shot Anders with and another gun, broke them into parts, gathered up the parts, put them in plastic bags and disposed of them in various dumpsters. [RR: VI at 181].

- Appellant saw a flier at a convenience store concerning James Anders, and felt

23

good the police didn't know who committed the crime. [RR: VI at 183].

- Appellant knew that Anders' body would eventually be found and a police investigation would ensue. [RR: VI at 245].

The scenario cast by the evidence in this case is exactly the type of situation that should be within the purview of a tampering-with-evidence provision such as § 37.09.

In this case, Appellant was charged with tampering with physical evidence, a human corpse, under subsections (a)(1)  of § 37.09 TEX. PENAL CODE, and under the plain and unambiguous language of statute,  and consistent with Texas jurisprudence, the evidence was sufficient to establish his guilt beyond a reasonable doubt.  Appellant concealed the human corpse of James Anders knowing an investigation was pending with the intent to impair its verity or availability in the investigation. *Lumpkin v. State*, 129 S.W.3d at 663; *see Barrow v. State*, 241 S.W.3d at 923; *Briscoe v. State*, No. 03-11-00014-CR, 2013 WL 4822878, at *6; *State v. Smith,* 436 S.W.3d at 762-63.

In Appellant's brief, he attempts to create a dichotomy between *Lumpkin* and *Briscoe* and the facts of the instant case. Appellant fabricates the proverbial straw-man, the sheriff's deputy making the traffic stop before Lumpkin swallowed the contraband, and the driver of the prostitute in the *Briscoe* case.  Accordingly, they were the individuals that could investigate or report the defendants' actions to the appropriate authorities. *See Appellant's Brief* at 11-12.  This in reality is a false narrative. Like in

24

*Lumpkin* and *Briscoe*, the evidence paints a picture of a criminal trying to distance himself from an investigation he knew was going to result. Appellant did not want any investigation taking place at the Juran home. [RR: VI at 176]. Appellant knew he was in trouble; he had just shot a man twelve times. [RR: VI at 166]. He cleansed the scene by throwing out the shell casings, disposed of the weapons by breaking them down and throwing the parts in various dumpsters, and attempted to rid the garage of the odor of his victim's decaying corpse. [RR:VI at 221-23, 225-27]. Appellant's behavior was clearly to thwart the investigative process and avoid detection.

The Second Court of Appeals was correct in following the statutory construction performed in *Lumpkin v. State*, 129 S.W.3d at 663, concerning the definition of the word "pending" as used in § 37.09(a)(1) and its judgment should be affirmed.

II.
NECESSITY OF REMAND

Count One of the indictment alleged that the Appellant:

Then and there knowing that an offense had been committed, namely murder, alter, or destroy or conceal a human corpse, with intent to impair its verity or availability as evidence in any subsequent investigation or official proceeding related to the offense.

[CR: I at 5].

The first paragraph of the indictment alleged that the Appellant:

That the said Defendant in the County of Tarrant and State aforesaid, on or about the 30th day of May, 2012 did then and there knowing that an

25

investigation or official proceeding was pending or in progress alter or destroy or conceal a human corpse with intent to impair its verity or availability as evidence in said investigation or official proceeding[.]

[CR: I at 5].

The application paragraph of the Court's charge read as follows:

Now, therefore, if you find and believe the evidence beyond a reasonable doubt, that the Defendant, George Anthony Thurston, in Tarrant County, Texas, on or about the 30th day of May, 2012, did then and there knowing that an offense had been committed, namely murder, alter or destroy or conceal a human corpse, with intent to impair its verity or availability as evidence in any subsequent investigation or official proceedings related to the offense, as charged in Paragraph One of the indictment; or, if you find from the evidence beyond a reasonable doubt, that the Defendant, George Anthony Thurston, in Tarrant County, Texas, on or about the 30th day of May, 2012, did then and there knowing that an investigation or official proceeding was pending or in progress alter or destroy or conceal a human corpse with intent to impair its verity or availability as evidence in any said investigation or official proceeding, as charged in Paragraph Two of the indictment, then you will find the Defendant guilty of tampering with or fabricating physical evidence.

[CR: I at 44-45].

The jury returned the following verdict:

We, the jury find the Defendant, George Anthony Thurston, guilty of the offense of tampering with or fabricating physical evidence as charged in the Indictment.

[CR: I at 48].

In measuring the sufficiency in this case, the Court of Appeals noted,

"[t]he first paragraph alleged that on or about May 30, 2012, knowing a murder had been committed, Thurston altered, destroyed, or concealed a

26

human corpse with intent to impair its verity or availability in a subsequent investigation of or official proceeding related to the murder. See Tex. Penal Code Ann. § 37.09(d)(1) (West 2011 & Supp.2013). Thurston also attacks his conviction under this paragraph, but based on our resolution here, we do not reach his arguments related to it. See Tex.R.App. P. 47.1."

*Thurston v. State,* 2014 WL 3536955 *1 n.3. Thus, in assessing the legal sufficiency of the evidence the Court of Appeals only determined the issue as to the second paragraph, the allegation made under Section 37.09(a)(1) of the Texas Penal Code. The sufficiency of the allegation as to Section 37.09(d)(1) was not determined by the Court and the State seeks to resolve the issue now.

Therefore, in the event this Court should reverse the judgment of the Second Court of Appeals on the issue of statutory construction concerning the definition of "pending" this Court should remand this case back to that court with instructions to conduct a sufficiency analysis on the charge stemming from paragraph one of the indictment emanating from Section 37.09(d)(1) of the Texas Penal Code. *See Gonzales v. State,* 2005 WL 2951481 *8 (Tex.App.-Dallas 2005, no. pet.)(not designated for publication); *see Ortiz v. State,* 2005 WL 2951505 *8 (Tex.App.-Dallas 2005, pet. ref'd)(not designated for publication).

## CONCLUSION AND PRAYER

The State prays that this Honorable Court affirm the decision of the Court of Appeals, as well as Appellant's conviction and in the alternative this case should be remanded to the Court of Appeals with instructions to conduct a sufficiency analysis concerning paragraph one of the indictment stemming from Section 37.09(a)(1) Texas Penal Code.

Respectfully submitted,

SHAREN WILSON
Criminal District Attorney
Tarrant County, Texas

DEBRA WINDSOR, Assistant
Criminal District Attorney
Chief, Post-Conviction

/s/ Charles M. Mallin
CHARLES M. MALLIN, Assistant
Criminal District Attorney
401 W. Belknap
Fort Worth, Texas  76196-0201
(817) 884-1687
FAX (817) 884-1672
State Bar No. 12867400
CCAappellatealerts@TarrantCountytx.gov

## CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes.  This document also complies with the word-count limitations of TEX. R. APP. P. 9.4(i) because it contains 6,751 words, excluding any parts exempted by TEX. R. APP. P. 9.4(i)(1), as computed by Microsoft Office Word, the computer software used to prepare the document.

/s/ Charles M. Mallin
CHARLES M. MALLIN

## CERTIFICATE OF SERVICE

A true copy of the State's merit brief has been e-served to opposing counsel, the Hon. Leigh W. Davis, leighwdavis@gmail.com, 1901 Central Dr., Ste. 708, Bedford, Texas 76021, and to Lisa McMinn, State Prosecuting Attorney, information@spa.texas.gov, P.O. Box 13046, Austin, Texas  78711, on this, the 17th day of April, 2015.

/s/ Charles M. Mallin
CHARLES M. MALLIN

H:\MALLIN.M31\BRIEFS\PD-1316-14_THURSTON,_George,_ST'S_MERIT_BF.doc