# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 25, 2022 Session

## STATE OF TENNESSEE v. BOBBY LOVIN

### Appeal from the Criminal Court for Claiborne County
### No. 2019-CR-3103  E. Shayne Sexton, Judge

_____

### No. E2021-00705-CCA-R3-CD
_____

A jury convicted the Defendant, Bobby Lovin, of two counts of rape of a child, and he received an effective sixty-four-year sentence. The Defendant appeals, challenging the sufficiency of the evidence on one count of rape of a child and the trial court's admission of the victim's recorded forensic interview. We conclude that the evidence is sufficient and that there was no error in the admission of the video, and we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Kendall Stivers Jones (on appeal), Assistant Public Defender – Appellate Division; Lief Ericson Jeffers (at trial), District Public Defender; and Robert Scott and William C. Jones, Assistant District Public Defenders, for the appellant, Bobby Lovin.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Jared R. Effler, District Attorney General; and Graham Wilson and Courtney Stanifer, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendant was charged with two counts of rape of a child after the seven-year-old victim disclosed sexual abuse to her older sister. The victim gave a forensic interview in which she recounted that the Defendant put his tongue in her mouth and forced her to perform fellatio in her mother's bedroom and in her bedroom. The trial court admitted the recorded interview over the Defendant's objection. At trial, the victim testified that she no longer recalled some of the events she recounted in her forensic interview, but she testified regarding one instance of rape occurring in her mother's bedroom. On appeal, the Defendant argues that the evidence was insufficient to support the rape occurring in the victim's bedroom, that the trial court erred by failing to make specific findings of fact to support the admission of the interview, and that the video did not possess particularized guarantees of trustworthiness and was accordingly admitted in error.

In August 2017, the victim lived with her three siblings: two older brothers and a thirteen-year-old sister. The victim's father had recently been arrested and jailed. The victim's mother had moved out of the home to live in a nearby town with a boyfriend. In the absence of the children's mother, the children's maternal aunt moved in to help care for them. The children's aunt brought her family, consisting of the Defendant, who was her boyfriend, and their child. According to the victim's sister, the Defendant and the victim's aunt lived with the children for "[m]aybe a year." The victim's sister testified at trial that she shared a room with the victim, that their room had a bed, and that the boys shared a separate room. The victim's paternal grandparents visited the children frequently, usually after attending church. The victim's grandmother at first agreed that the Defendant had been staying with the children only two to three weeks before the allegation of abuse, but later testified it was "much longer" and elaborated it was a period of months.

The victim was nine years old at the time of trial, and she testified that she knew the difference between the truth and a lie. She identified the video of the forensic interview, and the video was played at trial.

In the video, Ms. Bobbie Womack, a forensic interviewer at the Campbell County Children's Center, asked the victim if she knew the difference between the truth and a lie. The victim, who was absorbed in coloring, did not answer at first, and after a pause, shrugged her shoulders. Ms. Womack told the victim that they could only talk about real things in the room, and she held up a blue crayon and asked the victim if it would be "real or not real" if someone said the crayon was pink. The victim shook her head and

identified the crayon as blue.  She agreed she would only talk with Ms. Womack about things that were real or had really happened.

The victim gave a brief account of her family, including her father's arrest.  She said that when the police arrived, "they said, 'You're surrounded.'  No, they didn't say, 'You're surrounded.'  They … stopped at my house and we ran outside and then my mom put me in the bedroom and then we cried because they put my dad in jail."

Asked if something had happened to cause her to be brought to the Campbell County Children's Center, the victim said, "Somebody, … he sticked his bad spot in my mouth and then he kissed me on the lips.  Then he sticked his tongue in my mouth."  The victim identified the Defendant, whom she described as her uncle, as the perpetrator. During the interview, the victim drew a picture of the "bad spot," which resembled a penis.

The victim said that "this happened" "[m]ore than one time.  It happened three times.  In my mom's bathroom, in her bedroom, and in the living room.  That's where he kissed me on the lips and sticked his tongue in my mouth."  The victim then added, "And it also happened in the bedroom, my bedroom."  Ms. Womack asked the victim to tell about the first time that "this happened," and the victim said, "It was the other day."  She told Ms. Womack that her mother was not in the home, that her aunt was "gone," and that her cousin was outside playing.  The victim was in the house watching YouTube when the Defendant entered.  The victim told Ms. Womack, "He said come here, …and I said no, and he said come here, and then he screamed at me, and then I ran into my mommy's bedroom, and then he caught me, and then that happened."  Asked to elaborate, the victim said, "That's it."  Ms. Womack recalled that the victim had said the Defendant put his "bad spot" in her mouth and asked, "So is that what happened when you were in your mom's bedroom or was  -- did something else happen?"  The victim responded, "It was in the living room."  Ms. Womack summarized what the victim had stated about being "caught" by the Defendant in her mother's room, and the victim clarified, "I stayed in my mommy's bedroom trying to hide – finding somewhere to hide and then he caught me…. He sticked his bad spot in my mouth and then he – and then that was in my – the bathroom and then it was in the living room, he kissed me on the lips and sticked his tongue in my mouth."  The victim added, "And then it was in my – in the hallway I think or it was in my bedroom."   The victim stated that these things happened on different days when she was seven years old.

She confirmed multiple times that the Defendant put his "bad spot" in her mouth in her mother's bedroom.  She said she tried to bite it and accidentally let go.  She said that she had her clothes on and that she took them off because they were itching her.  The Defendant had his clothes on, but the victim told Ms. Womack that the Defendant did

"that," demonstrating pulling on the front of her pants. She clarified that he unbuttoned his pants. The victim stated the Defendant made her suck and lick his "bad spot," but that nothing happened to it or came out of it. She stated that it felt "yucky" "like chewing gum." The victim told Ms. Womack that the Defendant had told her that if she told anybody, "even include[ing] the DCS, it will get even worser."

Asked to tell what happened in "your bedroom," the victim said, "He sticked his bad spot in my mouth." Ms. Womack repeated "He stuck it in your mouth?" The victim answered, "Uh-huh (affirmative)." She said that no one witnessed these events. Asked if this had happened to anyone else, the victim responded, "No, just me. Why did he have to pick me?"

At one point in the interview, the victim told Ms. Womack that the Defendant came into the bathroom while she was urinating. When asked later to elaborate on what happened in the bathroom, the victim said that the Defendant told her "You're all right," and then let her go and closed the door. She clarified that the Defendant did not put his "bad spot" in her mouth and kiss her in the bathroom and that "something different" also did not happen in the bathroom.

The victim recounted that after the rape in her mother's bedroom, the Defendant let her go and she ran outside to cry to her sister. In the forensic interview, the victim described the disclosure to her sister as follows: "And she said, 'What?' and then I said, 'Nothing.' And she said, '[Victim], you're shaking.' And I said, 'Okay, okay. [The Defendant] sticked … his bad spot in my mouth, then he kissed me on the lips, and then he sticked his tongue in my mouth.'" The victim said that she walked around with her sister and that her sister promised to hurt the Defendant if he assaulted the victim again.

At one point in the interview, Ms. Womack stepped out, and the victim amused herself with mirrored circles which were attached to the walls. She opened her mouth and looked inside and said to herself, "Cavities. It's looking good." She continued to talk about cavities and to look inside her mouth. When Ms. Womack returned, Ms. Womack asked, "You looking at yourself in the mirrors?" The victim responded, "No," and volunteered, " I have one big cavity and two small ones."

At trial, the victim testified that there were things mentioned in the video which she did not remember. She did not remember if the Defendant put his tongue in her mouth, if something happened in the bathroom, or anything that occurred in her bedroom. She did not recall if the things she mentioned on the video happened on one day or more than one day. She confirmed that her bedroom and her mother's bedroom were separate rooms. She also testified that she slept in a chair in the living room because she did not

- 4 -

have a bed in her bedroom and said that her brothers and sister also slept in the living room.

The victim testified that when she was in her mother's room, the Defendant asked her to suck and lick his "bad spot." She demonstrated what happened. She testified that after she left her mother's bedroom, she told her sister about the abuse.

On cross-examination, the victim agreed that she did not like living with the Defendant and her aunt. Defense counsel asked, "[The Defendant] wasn't very nice, was he?" The victim responded, "A little bit." The victim was unhappy that her mother left the home, and she did not like her mother's boyfriend. She denied having previously accused her father or another person of touching her inappropriately.

Ms. Womack testified at trial regarding her training and qualifications. The victim's drawing of the Defendant's "bad spot" and a drawing the victim made of herself on the couch with a tablet were introduced into evidence. Ms. Womack testified that in a forensic interview, it is preferable to have the child give a narrative as opposed to answering "yes or no" questions. She agreed that the victim said she did not know the difference between the truth and a lie at the beginning of the interview and that she had to ask the victim about an example of what was real or not real. She agreed that in the video, the victim "talks a lot, but she doesn't talk a lot about one specific thing." Ms. Womack acknowledged that the victim said the abuse took place three times but listed four places where it took place. She agreed that from that point in the interview, she asked many "yes or no" questions. The victim at first asserted police said, "You are surrounded," during her father's arrest, and the victim later said that did not happen. Ms. Womack agreed that the victim said she was not looking at herself in the mirror and that this was untrue. She also agreed that the victim never said, "I don't know," and only said, "I don't remember," once. She agreed that the victim gave inconsistent accounts of what happened on the couch. Ms. Womack helped the victim prepare for trial by conducting a mock trial three to four times. On redirect examination, she testified she felt the victim's behavior in the interview was typical for a seven-year-old child.

The victim's sister confirmed the victim's account of the familial relationships and disclosure. She testified that she was at the "ball goal" with her two brothers and cousin while the victim was inside playing on the tablet. The children's aunt was at Walmart, and the Defendant was in the house. The victim came outside, visibly shaking and with the back of her underwear hanging out. The victim seemed frightened. The victim disclosed the abuse, and the victim's sister took the victim on a walk until the children's aunt returned. The victim's sister did not tell their aunt about the abuse because she did not think their aunt would believe her. She knew that her grandparents would come by later that day, after church, and she told them when they arrived. The victim likewise

testified that her sister told her grandparents about the abuse the same day it happened. The victim's sister testified that she found out about the abuse in the morning and that her grandparents also came by in the morning. She said that the victim told her that "this happened" twice. According to the victim's sister, the abuse occurred one time previously to the time the victim disclosed the abuse. The victim's sister agreed that the victim went into the house alone with the Defendant after one alleged instance of abuse. She said that the victim was in the house approximately twenty minutes prior to her disclosure.

The victim's sister denied making up the allegations to induce the Defendant to leave. She said she got along with the Defendant "[k]ind of." She did not ever hear her brothers claim the Defendant hit them and did not see the Defendant hit them.

The victim's paternal grandmother testified that she was told about the abuse by the victim and the victim's sister when she visited them after either the Saturday night church business meeting or the Sunday service. The victim's grandmother testified that her understanding was that "these things" "apparently" happened a day or two before the disclosure. She said that the victim told her "[i]t wasn't -- didn't just happen one time, it happened on two or three other times, too." She did not report the abuse to law enforcement because she was afraid of the Defendant and his family and also worried that the Department of Children's Services ("DCS") would take the children away if the abuse were reported. Instead, on the day after the disclosure, the children's grandparents concocted a story that the landlord was on his way to the house and that the Defendant and the children's aunt had to leave. The Defendant and the children's aunt left the home to avoid the purported visit of the landlord, and the children's mother came to stay with the children for one day. After the disclosure, the children's grandfather moved in with the children to care for them while the children's grandmother remained at the grandparents' residence, where she was caring for her own aging parents.

The victim's sister ultimately told the children's adult cousin about the abuse through Facebook messenger. The cousin testified that she saw a prayer request for the victim through Facebook and asked the victim's sister about the request through a private message. After she learned of the allegations of abuse, she called the police. She asked to remain anonymous because she was afraid of the Defendant's family.

On August 20, 2017, law enforcement came to the children's home and spoke with the victim's grandmother. The victim's grandmother testified that the children had told her about the abuse on a Saturday or Sunday and that Officer Hurley[1] came to the house

---

[1] Officer Hurley's first name was not given.

the following Sunday. The victim's grandmother acknowledged that when the officer told her about the allegation that the Defendant touched the victim, she responded, "[T]hat's what she says." The victim's grandmother had always believed the victim was truthful about the abuse. She agreed that the investigating officer never got out of his car. He was "[m]aybe" at the home for over thirty minutes, and she did not recall talking to any other officers.

The Defendant presented the testimony of his father, Mr. Bobby Lovin, Sr., who stated that during the time the Defendant lived with the children, he visited the Defendant "[m]ost every day." He would arrive around 1:00 p.m. and stay until around 4:30 or 5:00 p.m. The last weekend that the Defendant lived in the home, the Defendant's father was there on both Friday and Saturday. He testified that he was also there on Sunday and that Sunday was the day the Defendant left the home. He did not see anything unusual occur between the victim and the Defendant, and the victim was not acting unusual or acting nervous. He stated that the children had a good relationship with the Defendant and that they did not hate the Defendant.

Detective Gary Ruszkowski testified that he was the only investigator in New Tazewell and that he accordingly investigated all sorts of criminal activity. He did not interview the victim in this case and did not go inside the home or ask her to show him where the abuse occurred. He stated he was already familiar with the layout of the home and that, as a large man, he felt he would intimidate the victim if he attempted to speak with her about the abuse. He did not attempt to collect physical evidence because he did not think there would be any to collect. He was present during the forensic interviews of the children, and he suggested questions for Ms. Womack during the break in the interview. He said that he spoke with the victim's grandmother and that she was mistaken when she testified she only spoke with Officer Hurley. He acknowledged that he did not take a written statement from either grandparent. He attempted to contact the children's mother, but she did not ever agree to speak with him. He did not speak with the cousin who reported the abuse because she requested to remain anonymous when she called 911 and he was unaware of her identity until a few weeks before trial. Because he did not know who reported the abuse, he did not retrieve the messages between the victim's sister and cousin. He also did not retrieve video footage from Walmart showing that the victim's aunt was at Walmart during the rape in the victim's mother's bedroom. He stated that the victim's aunt had acknowledged that she was at Walmart during the relevant time.

The jury convicted the Defendant of two counts of rape of a child. At the sentencing hearing, the State introduced a recording of a telephone call made by the Defendant during the trial. In the call, the Defendant incorrectly tells a woman that the court said it would dismiss the case if the jury were to see the facility dog which was

present when the victim testified. The Defendant urges the woman to buy a dog whistle before coming to court and to blow it. After applying enhancement and mitigating factors, the trial court imposed a Range II, thirty-two-year sentence for each conviction. The court ordered the sentences to be served consecutively for an effective sixty-four-year sentence. The Defendant moved for a new trial, raising issues including the sufficiency of the evidence, the trial court's failure to make specific findings of fact regarding the forensic interview, and the court's admission of the interview, which the Defendant asserted did not show particularized guarantees of trustworthiness. The court found it had determined "that the State satisfied the statutory" requisites, and it denied the motion. The Defendant appeals.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant asserts that the victim's forensic interview does not support his conviction for the rape of a child occurring in the victim's bedroom. The State responds that the evidence is sufficient. We conclude that the victim's statement in the forensic interview is sufficient to support the conviction.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. In reviewing the sufficiency of the evidence, this court examines the relevant statutes and analyzes the evidence at trial to determine whether each element of the offense is supported by adequate proof. *State v. Stephens*, 521 S.W.3d 718, 723 (Tenn. 2017).

The Defendant was convicted of two counts of rape of a child. "Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522 (2017). Sexual penetration includes fellatio. T.C.A. § 39-13-501(7). Here, the Defendant does not contest the sufficiency of the evidence for the offense occurring in the victim's mother's bedroom, and indeed, the victim stated both in the forensic interview and in her trial testimony that the Defendant forced her to perform fellatio in her mother's bedroom.

The Defendant challenges his conviction for the act of rape of a child occurring in the victim's bedroom. He asserts that her trial testimony that she and her siblings slept in chairs in the living room makes it unclear whether she considered the living room to be her bedroom. We note that the evidence included testimony from both the victim and her sister that they had a bedroom and testimony from the victim's sister that it contained a bed, but in any event, the jury was not required to find that the victim's bedroom was any particular physical space. The State presented evidence that the Defendant forced the victim to perform fellatio in a room she described as her bedroom, and this was sufficient to distinguish the counts of the indictment.

The Defendant contends that the victim "never made specific statements" during the forensic interview or trial regarding a rape in her bedroom. During the forensic interview, the victim initially listed her bedroom as one of the places where "something" happened. After asking the victim about events in her mother's bedroom and the bathroom, Ms. Womack said, "How about when you were in your bedroom; tell me about what happened in your bedroom." The victim responded, "He stuck his bad spot in my mouth." Ms. Womack repeated the victim's answer as a question, and the victim answered, "Uh-huh (affirmative)." The victim did not remember the offense occurring in her bedroom at the time of trial. Although the victim only stated that the Defendant raped her in her bedroom at one point in the interview and although she did not remember the incident at trial, we are required on appeal to review the evidence in the light most favorable to the State. *Pope*, 427 S.W.3d at 368. The jury was entitled to credit the statement the victim made during the forensic interview that the Defendant put his "bad spot" in her mouth in her bedroom.

The Defendant asserts that the inaccuracies and inconsistencies in the forensic interview raise reasonable doubt regarding the second offense. *See State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) ("[A] jury's verdict will not be overturned unless there are inaccuracies or inconsistencies that 'are so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt.'" (quoting *State v. Radley,* 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999))). He argues that the level of detail the victim gave

regarding the rape in her mother's bedroom casts doubt on the rape in the victim's bedroom, because her account was less detailed. However, he cites to no legal authority that the descriptions of the two offenses must be comparably detailed. He also asserts that the victim's initial statement that something happened in the bathroom and her later statement that nothing that "was not supposed to happen" happened in the bathroom are an irreconcilable contradiction warranting overturning one of his convictions. However, we note that any contradiction did not concern the instance of rape in the victim's bedroom. Furthermore, the victim had earlier said that the Defendant came into the bathroom while she was urinating. The victim, not being an authority on criminal liability, told Ms. Womack about all of the Defendant's transgressions, from opening the bathroom door while she was urinating, to kissing her on the mouth, to rape. The Defendant also argues that the victim's statements were inconsistent because when Ms. Womack asked if the Defendant kissed her and put his tongue in her mouth only in the living room or in other places, she answered, "Other places," but when asked to tell about the other places, she said that he put his tongue in her mouth in the living room and then put his "bad spot" in her mouth in her mother's room. While the victim's narrative of the abuse is not always entirely clear in the interview, neither is her narrative so inconsistent or contradictory that it creates reasonable doubt, as a matter of law, regarding the second instance of rape. The victim stated during the forensic interview that the Defendant put his "bad spot" in her mouth in her bedroom, and she did not ever contradict that statement. Accordingly, the evidence is sufficient.

## II. Admission of the Forensic Interview

The Defendant argues that the trial court did not make adequate factual findings regarding the required statutory factors that the video had particularized guarantees of trustworthiness and that this court should review the issue de novo. The State responds that the trial court made proper findings and that the Defendant did not contemporaneously object to the trial court's lack of findings. The Defendant responds that he argued during the hearing against the factors necessary to find the interview trustworthy at trial. We conclude that the record supports the conclusion that the video contained particularized guarantees of trustworthiness, and it was accordingly properly admitted.

The admission of a forensic interview lies within the discretion of the trial court and is reviewed for abuse of discretion. *State v. Franklin*, 585 S.W.3d 431, 448 (Tenn. Crim. App. 2019). A trial court abuses its discretion when it "applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010).

Under statute, a video recording in which a child under thirteen is interviewed by a forensic interviewer regarding sexual abuse is admissible as substantive evidence in a trial on the sexual abuse if the requirements of the statute are met. T.C.A. § 24-7-123(a). The statute requires the State to make various showings regarding the qualifications of the interviewer and the nature of the recording, and it requires the child to authenticate the video and to be available for cross-examination. T.C.A. § 24-7-123(b)(1), (3), (4), (5), (6). At issue on this appeal are the requirements that the video must be shown in a pretrial hearing to "possess particularized guarantees of trustworthiness" and that "[t]he court shall make specific findings of fact, on the record, as to the basis for its ruling under this section." T.C.A. § 24-7-123(b)(2), (d).

The statute provides the following guidance on the requirement of finding particularized guarantees of trustworthiness:

> (2) The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pretrial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors:
> (A) The mental and physical age and maturity of the child;
> (B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;
> (C) The timing of the child's statement;
> (D) The nature and duration of the alleged abuse;
> (E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;
> (F) Whether the statement is spontaneous or directly responsive to questions;
> (G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;
> (H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;
> (I) The relationship of the child to the offender;
> (J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and
> (K) Any other factor deemed appropriate by the court;

T.C.A. § 24-7-123(b)(2).

Prior to trial, the court reviewed the video of the interview, and Ms. Womack testified regarding her training and education and other statutory factors relevant to the admission of the video. On cross-examination, Ms. Womack agreed that the victim initially said in the interview that she did not know the difference between the truth and a lie. She testified that the victim was able to distinguish between what was real and what was not real and that she was told that she could only say what was real during the interview. Ms. Womack agreed that the victim said the abuse happened three times but listed four places. She said that the characterization of the victim's statement as "all over the place" was "fair" but also "typical for a seven-year-old." Ms. Womack agreed that it is a sign of reliability if a child sometimes answers that she does not know or corrects the questioner, and she did not recall the victim doing either. It is best practice to elicit a narrative from the child, but she agreed that the interview was mainly "yes" or "no" questions. She did not recall the victim saying anything untrue, but agreed that the victim's narrative of her father's arrest included a statement that police told the residents they were surrounded and that the victim later corrected herself by saying police did not say that. She also agreed that the victim appeared to be looking at herself in the mirror at one point but answered no when asked if she was looking in the mirror, and that this answer was untrue.

The State argued regarding each statutory factor relevant to the trustworthiness of the interview. Regarding the victim's mental and physical maturity, the State merely offered that she was seven years old, but the court returned to this factor and asked for further argument. The State offered that the victim gave details regarding the abuse, that she made a drawing of the Defendant's genitalia, and that her explanation regarding what happened supported a finding of maturity. The State argued there was no apparent motive to distort the facts, that the disclosure took place close in time to the offense, that the victim's account reflected atypical sexual knowledge, that the recording equipment was accurate, that the victim's statements were responsive, and that the Campbell County Children's Center and Ms. Womack had the statutorily required qualifications.

The defense conceded the qualifications of Ms. Womack and the accuracy of the video and instead challenged the trustworthiness of the interview. The Defendant argued that the victim did not demonstrate adequate mental or physical maturity because she could not tell the truth from a lie. The defense contended that the victim did not give a narrative, that the questions were leading, and that the victim's statements were not spontaneous. The Defendant raised the victim's failure to answer that she did not know, her statement regarding police surrounding her home, and her denial that she looked at herself in the mirror. The defense conceded that there was no apparent motive to lie and stated that the nature and duration of the abuse and the relationship of the parties appeared to be neutral.

- 12 -

The trial court found that the State had satisfied the procedural requirements. It found that the video was "a typical seven-year[-]old child talking to an adult about something that - where the adult was in charge of the meeting" and that "it was your classic forensic interview that this statute protects." The trial court noted that "looking at the factors" and weighing what the victim was saying "it goes back and forth." The court ultimately concluded that the jury was capable of evaluating "the strengths and weaknesses of the statement." The Defendant argued that the State's proof was that the victim was a "normal run[-]of[-]the[-]mill seven-year[-]old" but that the statute required "guarantees of trustworthiness." The court responded that "the interview process was well done" and ruled that the video was admissible subject to the victim's authentication and availability for cross-examination.

It is clear from the record that the trial court considered each statutory factor and that the court found that the video possessed particularized guarantees of trustworthiness. However, the trial court did not make specific findings but only generally found the evidence was trustworthy. *See* T.C.A. § 24-7-123(d). This court generally looks to factual findings from the trial court in order to facilitate appellate review and to determine whether a trial court has abused its discretion. *See State v. Dycus*, 456 S.W.3d 918, 930-31 (Tenn. 2015) (the appellate court may review de novo if the trial court fails to make findings regarding diversionary factors); *State v. Pollard*, 432 S.W.3d 851, 864 (Tenn. 2013) (the appellate court may review de novo if the trial court fails to make proper findings regarding consecutive sentencing); *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997) (the appellate court may review de novo when the trial court has held a hearing under Tennessee Rule of Evidence 404(b) but failed to make findings regarding a material issue or balancing the probative and prejudicial value). We have previously held that when "there is virtually perfect compliance with the statute, but the court fails to make complete findings of fact" regarding the admissibility of a forensic interview, our review is de novo. *State v. Justin Tyler*, No. W2015-00161-CCA-R3-CD, 2016 WL 1756419, at *6 (Tenn. Crim. App. Apr. 29, 2016). Because the trial court's findings were conclusory statements indicating that the court found the victim's behavior and the interview, "typical," "normal," and "classic," we review de novo the sole contested issue of whether the interview held particularized guarantees of trustworthiness.

The Defendant argues that the victim "displayed a lack of maturity" and "did not convey her thoughts clearly." We conclude the mental and physical age and maturity of the victim at the time of the interview supports its admission. The Defendant asserts that she "displayed trouble with her command of reality," and he refers to her narration of her father's arrest and denial that she was looking at herself in the mirrors. While the victim did not directly answer Ms. Womack's question about knowing the difference between a truth and a lie, instead shrugging her shoulders, Ms. Womack subsequently clarified that the victim understood the difference between what was real and what was not real and

- 13 -

agreed that she would only talk with Ms. Womack about real things. The victim initially said that police told her family they were "surrounded," but her subsequent and immediate correction rather indicates that she was attempting to follow Ms. Womack's rules for the interview. Furthermore, despite the Defendant's success in eliciting from Ms. Womack testimony that the victim was not truthful when she said she was not looking at herself in the mirrors, the video suggests that the victim was looking specifically at her cavities rather than her "self" in the mirror and that her answer to Ms. Womack's question was merely literal. Although the Defendant asserts that the victim did "not convey her thoughts clearly," the victim clearly told Ms. Womack that the Defendant put his "bad spot" in her mouth in her mother's bedroom and in her bedroom. The trial court found that the victim's maturity was typical for her age, and the record supports this finding. We conclude that the video supports the conclusion that the victim possessed sufficient maturity and mental acumen to recount the instances of sexual abuse to Ms. Womack and to limit her statements to what she believed to be true.

The Defendant argues that the victim, who twice asked about her mother during the interview and said she anticipated living with her father when he was released from jail, fabricated the abuse in an attempt to reunite with her parents. We note that, at the time the video was admitted, the Defendant conceded that there was no apparent motive for fabrication, and we consider the appellate argument waived. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). We agree with the Defendant's concession at trial that there was no testimony, either at the hearing or at trial, to support a conclusion that the victim fabricated the allegations out of animosity toward the Defendant. Furthermore, there is no indication that the victim connected the disclosure of the abuse with the hope of reuniting with her parents; instead, it appears from Ms. Womack's statements that the victim's mother brought her to the interview and that she asked for her mother because she wanted to end the interview. Accordingly, this factor weighs in favor of admissibility.

The Defendant acknowledges that the interview took place close to the time of the offenses but asserts that the victim's narrative was not cohesive. We agree with the Defendant that the timing of the statement weighs in favor of admissibility, as it appears that the abuse was disclosed close in time to the offenses and that the interview occurred within two weeks of the initial disclosure.

Regarding the nature and duration of the abuse, the Defendant asserts that although the victim stated that the abuse took place over multiple days, the circumstances of her disclosure, including the fact that she was most consistent about the occurrences on the couch and in her mother's bedroom, indicate that the abuse only happened once. We

- 14 -

conclude that the nature and duration of the abuse weighs in favor of admission, as it appears that the victim had a physical reaction — shaking — to the rape occurring in her mother's bedroom and disclosed it close in time to the offenses.

The Defendant asserts that because the victim did not say that anything happened to the Defendant's "bad spot" or that anything came out of it, she did not display atypical sexual knowledge. However, the victim also told Ms. Womack that the Defendant forced her to suck and lick his "bad spot" and that he put his tongue in her mouth. These statements would be beyond a typical seven-year-old's knowledge and experience, and accordingly, this factor weighs in favor of admission.

Regarding whether the statement was spontaneous or directly responsive to questions and regarding the manner of the interview, the Defendant acknowledges that the victim was responsive to questioning but asserts that many of the questions were "yes or no" questions. Contrary to the Defendant's assertion that these questions were "leading," a leading question is "one which 'suggests a specific answer desired.'" *State v. Frank Kenneth Talley*, No. 01C01-9612-CC-00524, 1999 WL 722631, at *8 (Tenn. Crim. App. Sept. 17, 1999) (quoting Cohen, Paine, & Sheppeard, *Tennessee Law of Evidence*, § 611.6 (3d ed. 1995)). "The fact that a question allows for a 'yes' or 'no' answer does not make the question leading." *Amanda Smith v. William R. Walker, et al.*, No. M2012-00593-COA-R3-CV, 2012 WL 4167167, at *3 (Tenn. Ct. App. Sept. 19, 2012). When Ms. Womack asked the victim if she knew why she was at the Children's Center, the victim spontaneously disclosed that the Defendant had put his tongue and "bad spot" in her mouth. Ms. Womack then proceeded to ask questions to elicit specifics regarding the time and place of the abuse. We conclude that the manner of the interview was reliable and did not suggest to the victim that Ms. Womack was looking for any particular content in the victim's statements. None of the questions which could be answered with a "yes" or "no" inherently suggested that Ms. Womack was looking for either an affirmative or a negative answer to the question.

The victim lived with the Defendant, and in the forensic interview, she described him as her uncle. These factors tend to support the admission of the interview, as they establish that the Defendant had free access to the victim and was aware that the victim's parents were not there to protect her. The Defendant concedes that the video equipment met statutory requirements.

We conclude that the statutory factors support the trial court's determination that the interview bore particularized guarantees of trustworthiness. The Defendant argues that because the court at one point said, "it could go either way," the interview should have been excluded, but the trial court ultimately concluded that the interview was "well done" and should be admitted. While some of the victim's statements lacked clarity,

there was nothing to suggest that the interview as a whole was not trustworthy, and the trial court properly concluded that the jury, in its determination of credibility, could take into account any lack of clarity in the victim's individual statements. Accordingly, we conclude there was no error in the admission of the forensic interview, and the Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing, the judgments are affirmed.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE